

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHRISTOPHER J. WELLER　　　　:　　CIVIL ACTION—MEDICAL
　　　　　　　　　　　　　　　　　　:　　PROFESSIONAL LIABILITY ACTION
　　　　　　　Plaintiff　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:　　NO.　05-2758
　　　　v.　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
Cheryl Ransom-Garner　　　　　　:
Commissioner, Philadelphia　　　:
Dept. Human Services;　　　　　　:　　**FILED**
VALERIE JONES and　　　　　　　　:
DEFENDER ASSOCIATION　　　　　　:　　JAN 1 7 2007
OF PHILADELPHIA　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　:　　MICHAEL E. KUNZ, Clerk
　　　　　　　Defendants　　　　　　:　　Cy＿＿＿＿＿＿ Dep. Clerk

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF,**
**CHRISTOPHER J. WELLER'S REPONSE TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

**I.　PROCEDURAL/FACTUAL STATEMENT OF THE CASE**

　　Plaintiff, Christopher Weller ("Christopher" or "Plaintiff"), was born Christopher

Moon to Pearl and James Moon on May 15, 1985. Christopher was placed into legal

custody of the Department of Human Services ("DHS") on July 31, 1985 because of

neglect and possible abuse by his biological parents. On August 2, 1985, when

Christopher was two and a half months old, he was placed in the foster home of William

and Carol Weller, with his three older siblings, having been declared legally dependent.

Each of Christopher's three siblings eventually returned to their biological parents, except

for Christopher.

　　Christopher remained in the loving care of the Weller's with limited and

inconsistent visits with his natural family from August of 1985 until June of 1991. At that

point he was removed from the Weller's by the concerted action of Defendant DHS and with the assistance of Defendants Jones and Defender Association. During that period of time, the Weller's repeatedly expressed an interest in adopting Christopher. Defendant DHS agreed with the change in goal to adoption and formally acknowledged such in a January 13, 1989 Court filing.

In February of 1991, the Weller's were relocated to Tennessee for job reasons associated with Mr. Weller. The Weller's desired to and were able to take Christopher with them after securing written consent form the Moon's and Defendant DHS. During the four months that the Weller's were in Tennessee, from February to June 1991, the Moon's never contacted Christopher or the Weller's.

In May of 1991, the Weller's returned to Pennsylvania with the hope and expectation of adopting Christopher, but on July 8, 1991, at the insistence of Defendant DHS the Court removed Christopher from the Weller's and placed him temporarily with the Moon's. Almost immediately, there was a report of sexual abuse upon Christopher and at the recommendation of a Psychologist, Christopher's trial period with his parents was ended. However, instead of being returned to the Weller's, Christopher was placed with an Aunt of the Moon's whom Christopher did not know.

Thereafter, the Weller's filed a Petition to Intervene and with great pain, exhaustion and personal expense fought to have both their and Christopher's interest heard. During this time, the interests of the Plaintiff were allegedly being represented by Defendants Jones and Defender Association, who aggressively fought the Weller's efforts to intervene and to allow themselves to be heard. Defendants Jones and Defender Association at no time acquiesced to the Weller's simple request to be heard officially in

the Court case which case quintessentially should have been one solely involving the best interest of Christopher. Eventually, the Weller's were successful in being granted standing by the Court as amicus curiae.

All three Defendants, inexplicably, in intentional bad faith and with no regard for the best interest of Christopher, a minor child, failed to allow counsel for the Weller's access to numerous records of DHS, including the psychological and psychiatric reports. Unremarkably, the Weller's counsel was not permitted access to the significant report of Dr. Eileen Sexton, who was believed to be employed by Defendant DHS and whose opinion and reports the Weller's desired the Court to hear. It is believed and averred that as of that time, Defendants Jones and Defender Association had done little, if any investigation into the file and had not considered the reports which recommended that custody remain with the Weller's.

During November of 1991, Christopher had been referred to the Children's Crisis Center due to his misbehaving in school. There he was placed on Ritalin and Dr. Eileen Bazelon, a psychiatrist, was retained to evaluate Christopher's situation. Dr. Bazelon also had to fight for access to all of Christopher's records. Dr. Bazelon spoke with Dr. Sexton who reported that before Christopher was removed form the Weller's Christopher was cheerful, cooperative, well organized and expressed a clear desire to remain with the Weller's instead of the Moon's. By June 26, 1991, Dr. Sexton reported a marked change in Christopher where he was now angry, agitated, barely controllable and reported numerous accounts of sexual abuse at the hands of the Moon family.

Dr. Sexton's July 8, 1991 report stated that Christopher was depressed, withdrawn, sad, angry and lacking vitality and saying that he hated living with the Moon's and

wanted to return to the Weller's. It is believed that Dr. Sexton presented all these findings to the Defendants Jones and Defender Association and sent a report of the suspected child abuse to Defendant DHS, all of which were either ignored or dismissed by all three Defendants.

Similarly, Dr. Bazelon concluded in her January 14, 1992 report that Christopher had been abused by the Moon's and that Christopher had suffered and was continuing to suffer from post-traumatic stress disorder and depression. Dr. Bazelon recommended that it was urgently in Christopher's best interests to be returned to the Weller's and for the Moon family to have no further access to Christopher. Dr. Bazelon also expressed concern for possible permanent suffering for Christopher as a consequence of the emotional trauma he had experienced and was continuing to experience at the hands of the Moon's.

In an addendum to her January, 1992 report, Dr. Bazelon confirmed that she had requested but was denied the opportunity to present all her findings to the Court, during the June 26, 1991 hearing. Dr. Bazelon was unable to tell the court about the abuse of Christopher by his Aunt even though all three Defendants were aware of her findings and opinions. See report and addendum attached as exhibit "A". Dr. Bazelon wrote another similar report reconfirming her opinion and prognosis regarding Christopher dated January 15, 1992. See report attached as exhibit "B".

In January of 1992, Michael Churchwell, Esquire, of the Public Interest Law Center of Philadelphia, wrote to Defendant Defender Association and noted his concern for the glaring deficiencies in the work of Defendant Jones and her intentional misrepresentations made to the Court during the Fall of 1991. Despite the internal review

by Defendant Defender Association, occasioned by Mr. Churchwell's letter, Defendant

Defender Association, while acknowledging some errors in judgment, refused to remove

themselves from the case and persisted in their resistance to the best interests of

Christopher, their client. See exhibits "C" and "D".

Finally, on April 14, 1992 after nearly a year of abuse occasioned by the actions of

the Defendants, Christopher was returned to the Weller's in Tennessee by order of Judge

Sylvester, where he remains today. At present, Christopher has completed high school

but does not have a driver's license or a job and has shown no interest in college. At the

age of 20, Christopher is believed to still suffer from the effects of post-traumatic stress

disorder and the physical and emotional pain of his ordeal. It is therefore, believed that

Christopher's suffering is permanent. Plaintiff now seeks to hold Defendants Jones and

Defender Association liable for their negligence and misrepresentation associated with

their complete failure to act in the best interest of a minor child, Christopher.

## II.   ARGUMET AND LEGAL ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to

Interrogatories, and admissions on file, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law."

FRCP 56(c). In a motion for summary judgment, the moving party carries the burden to

demonstrate the absence of any genuine issue of material fact. Goussis v. Kimball, 813

F.Supp. 352, 354 (E.D.Pa. 1993); citing, Celotex Corp v. Catrett, 477 U.S. 317, 323, 106

S.Ct. 2548, 2553 (1986).

A genuine issue of material fact exists when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The substantive law will identify which facts are material. See id. When reviewing a motion for summary judgment, all reasonable doubts and inferences are in favor of the nonmoving party. Arnold Pontiac-GMC v. General Motors Corp., 700 F. Supp. 838, 840 (W.D. Pa. 1988).

Here, the motion is premature as the record has not been sufficiently established to aver or withstand such a motion. As a consequence of such and given the current state of absolute immunity law, Defendants have not met their burden of establishing that there is no genuine issue of material fact.

### B. The Summary Judgment Motion Should be Denied as the Record is Insufficient to Aver or Oppose Such a Motion

In Celotex the Supreme Court elaborated on the type of evidence that the nonmoving party is required to produce in order to withstand a motion for summary judgment. The Court stated that "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred [a genuine issue of material fact]". Celotex Corp v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986). Rule 56 (c) refers to pleadings, depositions, answers to interrogatories, admissions, and, if available, affidavits to aver or oppose a Summary Judgment motion. See FRCP 56(c).

Here, Defendants seek Summary Judgment based on the common law doctrine of absolute immunity by attempting to create an analogy between Defendant Jones' role as a Child Advocate for Plaintiff and that of a guardian ad litem, who is entitled to absolute immunity for certain tasks. See Hughes v. Lynn E. Long, et al., 242 F.3d 121, 127 (3d Cir

6

2001)(internal citation omitted). Currently, the Third Circuit recognizes that a Guardian ad litem is entitled to absolute immunity when acting as an "integral part[] of the judicial process." Briscoe v. LaHue, 460 U.S. 325, 335, 103 S.Ct. 1108 (1983).

In a non-exhaustive list, the Third Circuit articulated certain acts that would fall within the purview of being integral, such as testifying in court, prosecuting custody or neglect petitions and making reports and recommendations to the court. Gardner v. Parson, 874 F.2d 131, 146 (3d Cir. 1989). The key is if the guardian ad litem is acting as a functional "arm or the court." Id. However, and most important to this matter, guardian ad litems are NOT granted blanket immunity for all their duties or acts. Id. at 145 (emphasis added). Investigative or administrative acts are not granted absolute immunity. Ernst v. Child & Youth Services of Chester County, 108 F.3d 486, 497, n.7 (3d Cir. 1997).

In Defendant's motion for Summary Judgment, Defendant states that discovery has been underway for a number of months and that Plaintiff's interrogatories have been answered. However, the only discovery that has been completed are the interrogatories. Defendant further states that the role of Child Advocate in dependency hearings in Philadelphia is fairly standard and as such the function of Defendant Jones can be easily ascertained. WHERE, IN THE CURRENT RECORD, IS THE SUPPORT FOR THAT ASSERTION? However, all the exact roles of Defendant Jones have not yet been ascertained but must be in order to find Defendant Jones immune for all her acts/omissions. Lastly, Defendant generally states that Defendant Jones functioned as an agent and arm of the court in investigating matters, reporting her findings and making

recommendations and as such should be entitled to absolute immunity but does not point to any specific acts or instances.

This argument is faulty on at least two levels; first, it presumes that the three acts listed above were the only material acts of Defendant Jones in this matter and second, it therefore argues that Defendant Jones should be grated a blanket immunity for all her acts and should thus be granted Summary Judgment.

As articulated in the statement of the case above (Section I), Defendant Jones is believed to have performed many acts of negligence or failed to perform other necessary acts, which would equate to negligence that, at the least, raises a question as to whether defendant Jones would be immune under a guardian ad litem standard. For instance, the failure to respond to the multiple warnings by Dr. Bazelon, Dr. Sexton and Michael Churchwell as well as the failure to give Dr. Bazelon and counsel for the Weller's access to the necessary records, has no relation to the "judicial process" nor transforms Defendant Jones into a "functional arm of the Court."

It is further believed that many other acts/omissions of negligence, presently unknown to Plaintiff would be uncovered as discovery moved beyond its initial stages. Therefore, necessary discovery is still yet to be done by both parties to ascertain all the acts/omissions performed by Defendant Jones before any valid immunity argument can be raised.

Defendants cite to <u>Harris v. Lehigh County Office of Children & Youth Services, et al.</u>, where the Eastern District of Pennsylvania denied a motion to dismiss on absolute immunity grounds and recommended further discovery because it did not yet know the exact functions performed by the attorney in order to see if the acts were an integral part

of the judicial process. 418 F. Supp.2d 643, 650 (E.D. Pa. 2005). Defendants then try and

contrast <u>Harris</u> to the matter at hand by stating that here discovery has been underway for

a number of months. Yet, <u>Harris</u> cannot be contrasted as it is almost the exact situation

we have here. Yes, discovery has been underway for some months, but is only in the

interrogatories phase and, as such, the facts by which to analyze Defendant Jones's exact

functions in the matter have not yet been determined.

As such, Defendants are unable to prove that there is no genuine issue as to any

material fact based on the pleadings, depositions, answers to Interrogatories, and any

admissions in order to sustain a judgment as a matter of law and therefore the motion

should be denied.

### C.  The Summary Judgment Motion Should be Denied as Defendants Improperly Seek to Extend Current Law in a Pre-Trial Motion

Defendants articulate that Defendant Jones is entitled to absolute immunity for all

her acts based on an analogy to the common law doctrine of absolute immunity for a

guardian ad litem. While Defendant Jones's acts may have been in some way similar to

that of a guardian ad litem her role in the matter was as a Child Advocate. She was acting

as an attorney supposedly representing the best interests of her client.  As such,

Defendant is improperly attempting to extend and change current common law in a

pretrial motion.

Summary judgment is appropriate where there is no genuine issue as to any

material fact. FRCP 56(c). As articulated by the Supreme Court, a genuine issue of

material fact exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. Here, it is well within the

sound discretion of the finder of fact to determine that the acts of a Defendant Jones are not entitled to absolute immunity as a guardian ad litem or other.

The decision whether or not to extend absolute immunity to different parties has produced a wide variety of results. The Supreme Court has provided absolute immunity for judges (Pierson v. Ray, 386 U.S. 547, 87 S. Ct. 1213 (1967)), legislators (Tenney v. Brandhove, 341 U.S. 367, 71 S. Ct. 783 (1951)), and prosecutors (Imbler v. Pachtman, 424 U.S. 409, 96 S. Ct. 984 (1976)) for certain acts but not all acts. Futhermore, the Third Circuit has refused to grant absolute immunity for a social worker in his actions on behalf of the state in investigating and gathering information. Miller v. The City of Philadelphia, 174 F.3d 368, 376 (3d. Cir 1999). As well, the Pennsylvania Supreme Court has refused to grant absolute immunity for expert witnesses in their negligence in formulating an opinion. LLMD of Michigan, Inc. v. Swift, 559 Pa. 297, 307, 740 A.2d 186 (1999).

Therefore, the decisions on whether to grant or deny absolute immunity to a Child Advocate and if a Child Advocate is sufficiently analogous to a guardian ad litem are in no way material facts without genuine issue. A finder of fact could easily and properly determine that immunity should not be extended to all the acts of Defendant Jones. As such, Defendants are not trying to accurately interpret current common law, but rather extend the common law and such an act is inappropriate in a pretrial Summary Judgment motion and should therefore be denied.

### D. Defendant Jones Should not be Held Absolutely Immune From Suit Based on Guardian Ad Litem Immunity

Defendants posit that Defendant Jones's role as Child Advocate in this matter is analogous to the role of a guardian ad litem. As such, Defendants argue that Defendant Jones is entitled to the same common law immunity as a guardian ad litem. While it is

true that some of the known act of Defendant Jones and some of the "typical" acts of a Child Advocate are similar to that of a guardian ad litem, the roles are not at all analogous and do not provide for a blanket immunity.

Even if the role of a Child Advocate is seen as analogous to that of a guardian ad litem, absolute immunity would still not apply to all acts of Defendant Jones, only those acts integral to the judicial process. Defendants try and paint a picture where the title of Child Advocate is equivalent to the title of guardian ad litem and as such Defendant Jones should be absolutely immune for all her acts. However, The Supreme Court has stated that in deciding whether to apply absolute immunity a Court should look at the function of the official not at the official's status or title. See Butz v. Economou, 438 U.S., 478, 508 (1978). As such, Defendant Jones could be called a Child Advocate, a guardian ad litem or anything else because the name is irrelevant and all that matters are the acts and functions performed by Defendant Jones.

The statutorily dictated powers and duties of a guardian ad litem are: representing the best interest of the child; meeting with the child on a regular basis; review all relevant records and reports; participate in all hearings in a degree adequate to represent the child; conduct any necessary further investigation; interview, examine and cross-examine witnesses; stay updated on plans to modify custody or visitation of the child or any related proceedings; make recommendations to the court relating to the appropriateness and safety of the child; explain proceedings to the child; and advise the court of the child's wishes. 42 Pa.C.S. § 6311(b)(1-9).

Alternatively, the duties of a Child Advocate are to explain to the child, as best possible, all legal proceedings involving the child; advise the judge about the child's

ability to understand and cooperate with any proceedings; and assist or secure assistance for the child and family in coping with the impact of the crime and legal proceedings. 42 Pa.C.S. § 5983(a)(1-3).

As for Defendant Jones, many of her acts are not known. Defendants state that Defendant Jones investigated matters, reported her findings and made recommendations but no dates, times or specific acts with specific parties are stated by Defendants or yet known by the plaintiff. As alleged, Defendant Jones' acts or omissions involved investigating and reviewing expert reports relating to Plaintiff's custody and relaying the reports to the Court, represented any potential conflicts of interest to the Court, making sure the Court has all relevant records, reviewing records, talking to the Plaintiff client to determine the interest of the Plaintiff Client and representing the best interests of the Plaintiff client. See Compl. at 18, 22, 24, 34, 64.

As stated above, a guardian ad litem is held absolutely immune for acting as a functional "arm of the court" in non-investigative and non-administrative acts. See Ernst, 108 F.3d at 497, n.7; see also Gardner, 874 F.2d at 146. While guardians are given immunity for some acts, they are not granted immunity for the performance of all duties and most importantly, are not granted immunity merely in their capacity as an advocate. Gardner, 874 F.2d at 145. A guardian ad litem is thus granted immunity based their prosecutorial function that is intimately associated with the judicial process. Id. (quoting Imbler v. Patchman, 424 U.S. 409, 430-31, 96 S. Ct. 984 (1976)). It is the prosecutorial-like function that dictates whether or not to cloak a particular person with absolute immunity.

In <u>Ernst</u>, the Third Circuit recognized a prosecutorial-like immunity for a social worker based on the need to allow social workers to use their judgment in making quick decisions, sometimes based on limited time and incomplete information as to on whether to initiate certain proceedings. <u>Ernst,</u> 108 F.3d at 496. Defendant Jones, however, was not required to make the type of quick and discretionary decisions in the Plaintiff's custody matter that a prosecutor, guardian ad litem or child welfare worker would in their legal forums.

Like any other private counsel, Defendant Jones was able to methodically and deliberately review evaluations and reports to determine the best interest of the Plaintiff. Defendant Jones was not required to exercise her judgment under any constraints similar to a prosecutor or social worker. Defendant Jones was relatively free from time pressure and therefore would not have been required to make any "snap" judgments that could later be seen as questionable. Thus, in this sense, Defendant Jones in no way acted like a prosecutor, social worker or guardian ad litem. Further, one of the key acts which Plaintiff believes gives rise to liability on Jones part is her absolutely inexplicable insistence on continuously objecting to standing by the Wellers, the couple who had had the longest relationship with the child.

The policy behind cloaking prosecutors with absolute immunity for certain acts is to benefit the public. It is to prevent prosecutors from being too cautious in intervening in matters out of fear of personal liability, thus weakening the criminal justice system. <u>Id</u> at 494-95(discussing <u>Imbler,</u> 424 U.S. at 424-29). However, as related to Defendant Jones, no such public policy concerns are present. Defendant Jones did not have to make a similar decision on whether to enter the matter; she was already part of the matter when

her questionable acts took place. As such, cloaking Defendant Jones in absolute

immunity would be no benefit to the public. Here, Defendant Jones' acts were more

attune to a privately hired or court-appointed attorney, who is fully responsible for their

own acts and receives no immunity for possible negligence in the representation of a

client. The reasoning for such a difference in immunity between a prosecutor and a court-

appointed attorney was articulated by the Supreme Court in <u>Ferri v. Ackerman</u>, which

stated:

> There is, however, a marked difference between the nature of counsel's
> responsibilities and those of other officers of the court. <u>As public
> servants, the prosecutor and the judge represent the interest of society
> as a whole</u>. The conduct of their official duties may adversely affect a
> wide variety of different individuals, each of whom may be a potential
> source of future controversy. The societal interest in providing such
> public officials with the maximum ability to deal fearlessly and
> impartially with the public at large has long been recognized as an
> acceptable justification for official immunity. The point of immunity
> for such officials is to forestall an atmosphere of intimidation that
> would conflict with their resolve to perform their designated functions
> in a principled fashion.
>     <u>In contrast, the primary office performed by appointed counsel
> parallels the office of privately retained counsel</u>. Although it is true
> that appointed counsel serves pursuant to statutory authorization and in
> furtherance of the federal interest in insuring effective representation
> of criminal defendants, his duty is not to the public at large, except in
> that general way. His principal responsibility is to serve the undivided
> interests of his client. Indeed, an indispensable element of the effective
> performance of his responsibilities is the ability to act independently of
> the Government and to oppose it in adversary litigation. The fear that
> an unsuccessful defense of a criminal charge will lead to a malpractice
> claim does not conflict with performance of that function. If anything,
> it provides the same incentive for appointed and retained counsel to
> perform that function competently. <u>The primary rationale for granting
> immunity to judges, prosecutors, and other public officers does not
> apply to defense counsel sued for malpractice by his own client.</u>

444 U.S. 193, 202-04 100 S. Ct. 402, 408-09 (1979) (emphasis added).

In this sense, Defendant Jones' role was far more in tune with a court appointed or privately hired attorney then a prosecutor. As such, Defendant Jones is in no way entitle to absolute immunity for all her acts regardless of if her role of a child advocate is determined to be analogous to a guardian ad litem. Defendant Jones performed or failed to perform many investigative and administrative acts in her dealings with the Plaintiff, the Weller's and the doctors that are completely separate form any judicial function and are thus not entitled to immunity. Therefore, Defendants Summary Judgment motion is inappropriate and should be denied.

### E. Defendant Defender Association Should be Held Vicariously Liable for the Actions and Omissions of Negligence of Their Agent, Defendant Jones

Defendants state that since Defendant Jones should be immune for all her acts as quasi-guardian ad litem, then her employer, the Defendant Association of Philadelphia cannot be held vicariously liable. It is a well established principle that traditional vicarious liability rules makes employers vicariously liable for acts of their agents or employees within the scope of their authority or employment, even if the employer did not authorize or did not know about the employee's acts. Meyer v. Holley, 537 U.S. 280, 286, 123 S. Ct. 824, 829 (2003).

Here, since Defendant Jones cannot be held absolutely immune from all her acts relating to the plaintiff, the Defendant Association of Philadelphia cannot escape possible vicarious liability from the acts of their employee, Defendant Jones. As such, partial summary judgment as to the vicarious liability of the Defendant Association of Philadelphia is inappropriate and should be denied.

Respectfully submitted,

LAW OFFICES OF GREGORY G. STAGLIANO
A Professional Corporation

GREGORY G. STAGLIANO

## CERTIFICATE OF SERVICE

I, GREGORY G. STAGLIANO, ESQUIRE, attorney for Plaintiff, Christopher Weller, hereby state that a true and correct copy of the foregoing Plaintiff's Response to Motion for Summary Judgment of Defendant, Valerie Jones, Esquire, and for Partial Summary Judgment as to the Defender Association of Philadelphia, was sent by first-class mail, postage prepaid, on the date set forth below, and was served upon the following individuals:

Kimberly A. McCarthy, Esquire
Post & Schell, P.C.
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103

Jeffrey S. Simons, Esquire
City of Philadelphia / Law Dept.
One Parkway
1515 Arch Street
Philadelphia, PA 19102

Honorable J. Curtis Joyner
U.S. Courthouse
601 Market Street, Room 8613
Philadelphia, PA 19106

**FILED**

JAN 1 7 2007

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

LAW OFFICES OF GREGORY G. STAGLIANO, P.C.

_____
GREGORY G. STAGLIANO, ESQUIRE
Attorney for Plaintiff, Christopher Weller

DATED:   January 16, 2007

EXHIBIT "A"

EILEEN A. BAZELON. M.D.
THE CAMBRIDGE. APT. 105
2967 SCHOOLHOUSE LANE
PHILADELPHIA, PENNSYLVANIA 19144
—
TELEPHONE 844-2333

January 14, 1992

Ms. Marjorie Greenfield
Anderson & Greenfield
1025 Penn Mutual Tower
510 Walnut Street
Philadelphia, PA   19106-3610

Dear Ms. Greenfield:

        Pursuant to the court order of December 12, 1991, I spoke
with Ms. Sandra Steiker and Dr. Eileen Sexton about Christopher
Moon.  The following report reflects my review of the clinical
material and includes conclusions and recommendations based on
that review.

        The facts in this case are well known so that I will
summarize them briefly.  Christopher was placed in foster care
with the Weller family at age two months because of neglect and
possible abuse by Pearl and James Moon, his biological parents.
He remained with the Wellers until June of 1991 when his custody
was thrown into question by the Wellers' move out of state and
the refusal of his biological parents to relinquish him.  Trial
visitation with the Moon was arranged, but before it got beyond a
weekend overnight visit, allegations of sexual abuse were brought
against the Moons and the child was transferred to the home of
his maternal aunt, Crystal Dufy, someone who had no previous
relationship with the child.  He remains with his aunt at the
present time, has had no contact with the Wellers, and continues
to see his biological family in supervised visitation.

        In June and July of 1991, Eileen Sexton, Ph.D., a
psychologist with the Defender's Association evaluated
Christopher in an attempt to determine with whom this child
should live.  In doing her evaluation, Dr. Sexton had no access
to the file on the Moons; her only resource was the child
himself.  I am underlining this because most psychologists have
access to background material in evaluating a child.  Yet her not
having this material makes her report more, rather than less
valuable.

        Sandra Steiker, M.S.W., saw Christopher after his placement
with Ms. Dufy in an effort to substantiate the allegation of
sexual abuse.  She has continued to see him weekly and has had
access to the Moon family, Ms. Dufy, and Christopher's teacher.
She could have called the Wellers to discuss the child but to my
knowledge has not done so.

-2-

Eileen Sexton shared her clinical material with me, including Christopher's drawings.  Ms. Steiker spoke with me for an extended period and sent me copies of her clinical notes. Both clinicians were extremely helpful and cooperative.

I am also hoping to speak with a psychiatrist at the Children's Crisis Center who evaluated Christopher in November, 1991 because he was having difficulties concentrating at school. Since I did not reach him by the time of this writing, I will send an additional letter after talking to him.

<u>Findings of Dr. Sexton:</u>

Dr. Sexton saw Christopher for the first time on June 7, 1991, prior to his first overnight visit with the Moons.  During that session, he was cheerful, cooperative, well-organized, and task oriented.  He completed the tasks assigned to him without difficulty and with energy, vitality, and precocity.  In short, he was at all times organized, well-behaved, and appropriate for a child his age.  He clearly stated that he "felt bad about Pearl's decision" i.e. to have him live with her and he clearly indicated that he considered the Wellers' home his home.  When he talked of moving to "Pearl's", he was frankly sad.  "I want to live with my foster parents."

He saw Dr. Sexton for the second time on June 12, 1991, following an overnight or weekend visit to the Moons.  Carolee Weller accompanied him to the visit.  Christopher quickly followed Dr. Sexton to her office and in response to her question "Did you have fun" (at the visit) he said, "I had no fun at Pearl's house.  They touched me on my private parts."  He then spontaneously produced a series of drawings.*

I will summarize the content of the drawings since to understand my conclusions, one must appreciate the drawings.

The first drawing was of Pearl** who appears as a large ghostlike figure with a cigarette hanging from her lips.  Her profile is turned away from the child who appears upside down in the drawing.  A large hand reaches out to touch the child's genital area.  In response to open-ended, "non-leading" questions, Christopher told Dr. Sexton that Pearl had touched his private parts.  A "ghostbuster" symbol completed the drawing.

*I urge the court to examine the drawings themselves as they are the most powerful statement of the events that Christopher, a six year old child could produce.

**It is clearly labeled Pearl as the other drawings bear the names of each family member.

-3-

The next drawing was quite similar in style and theme.  In this one Jimmy replaced Pearl as the ghostlike figure whose large hand reached out to touch the genitals of the upside down child on the left side of the page.  Drawings of Timme and Jim Moon performing the same act followed, complete with name and a large "X"* and a ghostbuster symbol.  CHristopher became angry and agitated as he drew.  She asked about Steven; he told her to draw Steven.  Kevin, he said was not there .  (In fact, Kevin was in Florida).  He told Dr. Sexton, again spontaneously, that the members of his biological family had also put their fingers in his "doodoo".**  Over Timme's name, Chris vehemently scribbled, saying "No, no."  Christopher revealed that the Moons had videotaped the molestation.  Because of the child's evident agitation, Dr. Sexton ended the session with Christopher.

She then questioned Ms. Weller in an effort to determine the veracity of Chris' story.  Ms. Weller described a profound change in Chris' behavior following the overnight:  he did not give her a hug and kiss upon seeing her, as was his wont; he became immediately demanding in ways he had not been before, and he became inconsolably hysterical in the car.  Later that evening he told Ms. Weller that "he'd had no fun at Pearl's.  They touched me on my private parts."  Based on her conversation with Carolee Weller, Dr. Sexton felt confident that Ms. Weller had not "put Christ up to" these allegations of abuse by the Moons.***  She also confirmed with Kathy Melot, Chris' Concern social worker, that his behavior following the visit was different from usual and that Chris had said to her (Melot), "I have bad things to tell you, things you don't want to hear."

Dr. Sexton saw Christopher twice more in June, the 17th and the 26th.  She found him a much changed child from their first session with him on June 7th.  In session three, he was angry, agitated, and barely controllable.  He ran around the room, playing out a Ghostbuster fantasy.  In his play, the Ghostbusters were coming in via the window "to get the bad ghosts, who were Jimmy, Timme, and Steven."  He repeated that "everybody had touched his private parts and put their fingers in his "doodoo".  In the play, he was counting on the Ghostbusters to save him from the bad people, the Moons.  Christopher was frantic during much of the session; he became so agitated that Dr. Sexton ended the session.

*This represented No or wrong.

**Christopher used this word to mean anus.

***It is significant that Carolee Weller told Dr. Sexton that she did not believe Chris, that the story was incredible.  This statement also attests to her lack of duplicity.

-4-

On June 26, 1991, Christopher arrived carrying various kinds of ghostbuster toys and equipment. He had obviously become a ghostbuster in order to protect himself. "I'm going to trap all those mean, bad people, I told you about," he whispered. He named the same "bad" people. Dr. Sexton then asked "Has anyone else touched you on your private parts." He responded, "Crystal." Dr. Sexton: "Who is she?"* Chris: "My aunt." Christopher then repeated that he wanted to live with the Wellers. "My name is Chris Weller. It used to be Moon, but not anymore." Christopher instructed Dr. Sexton to tell the judge that he wanted to live with the Wellers. He became increasingly angry and fearful of the Moons. Of Aunt Crystal, he said, "She is mean."

Dr. Sexton presented her findings to Val Jones, the attorney for Child Advocate and Michael Lewis, CAU social worker. She also made a report of suspected child abuse to DHS. A copy of her extensive report was sent to DHS and to the court. An investigation of the abuse followed, but Christopher refused, as he has to this day, to talk about the abuse to anyone else: not to the physician who examined him, nor to the police or to DHS. It is noteworthy that Carolee Weller did not accompany him to any of the other investigatory interviews. This is of some importance as it is well known that young children often do not share charged material with strangers unless they are in the presence of someone who they know loves them. Also, Christopher may have been threatened with terrible punishment if he told or he may have shutdown because no one listened.

Dr. Sexton saw Christopher one last time, on July 8, 1991, after he had been placed with Ms. Dufy. She found him depressed, withdrawn, sad, angry, lacking in vitality. Chris was inconsolable, and said of the Dufys he said, "I hate being there." He told her repeatedly he wanted to return to Tennessee to the Wellers, he wanted to be as far away from the Moons as possible. He counted the days until the next court hearing when he might tell the judge he wanted to go home to the Wellers. He refused to leave her office at the end of the session, and had to be carried out.

Crystal Dufy insisted on talking to Dr. Sexton. She related that Christopher developed a severe headache, nausea, and vomiting after he heard that Carolee Weller had returned to Tennessee.

*Eileen Sexton, having no background information, did not know who Crystal was.

Dr. Sexton remains convinced that Pearl, James, Jimmy, Timme, and Steven Moon all abused Christopher during a weekend or overnight visit between June 6th and June 12th. She is also convinced that Crystal Dufy molested Christopher although she does not know when this occurred. Her argument is and there is no reason to doubt it, that Christopher was accurate and consistent in his story, that he told it in childish language, and that he did so unprompted by her. His behavior changed, and he developed an elaborate fantasy based on the movie Ghostbusters to deal with the trauma.

## Ms. Steiker's Report
In contrast, Christopher has never talked of the abuse to Ms. Steiker despite her persistent questions. In her office, he is agitated, disorganized, uncooperative, and guarded. He is often preoccupied with fantasy and speaks in detail of ghosts of whom he is quite afraid. He has told her that he loves Carolee Weller "most of anyone in the world," but also has refused to tell her with whom he would like to live. Ms. Steiker complained repeatedly to me that the child would not talk to her and that she, therefore, could not make a recommendation. She has observed him with his biological family on more than one occasion, and cannot herself make much of Chris' behavior with them. She is put off by Pearl Moon's evasive answers to questions about the reasons for Christopher's long placement in foster care. She finds Ms. Dufy an adequate caretaker. Ms. Dufy has revealed to her that Chris has been behaving badly at her home. Chris' inability to focus and agitation at school resulted in a referral to a psychiatrist who labelled Chris as attention deficit disorder, and prescribed a trial of Ritalin.

Christopher's behavior in Ms. Steiker's office was so agitated and frantic and she could make so little of the session that she called in an art therapist to assist her with the child. Since that time, Christopher has drawn pictures but has refused to talk to the therapist.

I had one other exchange with Ms. Steiker that I think is revealing. The Wellers had Christmas presents North for Christopher and I asked if Ms. Steiker would give them to him. She refused saying that she felt it would disturb the Moon family to have Christopher receive presents from the Wellers.

## Clinical Impressions
It is true that I have never seen Christopher; however, I have had access to extensive clinical material on him and spoken at length with Dr. Sexton and Ms. Steiker.

Based on that review, I am, within a reasonable degree of medical certainty, convinced that Christopher was sexually abused by Pearl, James, Jimmy, Timmy and Steven Moon. I also think he was sexually abused by Crystal Dufy on some occasion. The child

-6-

has said the abuse was videotaped, and I think an effort should
be made to look for a tape. Chris' drawings stand on their own;
they are powerful, consistent, and filled with appropriate
emotional content. He even includes the ghostbuster symbol, an
amulet or charm that he hopes will vanquish his enemies and
protect him from destruction.* When he drew pictures, he was
understandably angry and agitated as he was recounting a very
traumatic event.

The change in his behavior from June 5, 1991 to June 12,
1991, also validates his story of abuse. During his first
session with Eileen Sexton, he was a healthy, well-developed,
well-organized child, in other words, normal with excellent
trust and a good ability to relate to the examiner. Since then
he has become agitated, angry, disorganized, frantic, given over
to fantasy, and unable to cooperate. He cannot function at
school; someone thinks he even has attention deficit disorder.
None of this lack of functioning or malfunctioning was present
before June 12, 1991. Ms. Steiker is seeing a child who is
suffering Post-Traumatic Stress Disorder and is responding as any
healthy person would to the extreme stresses of sexual
molestation and loss of his psychological parents. Both stresses
and they are equally important, combine to produce a child who
now looks quite disturbed. That he refused to tell his story to
DHS, the police and Ms. Steiker is immaterial. It is quite
common for a child to "clam up" either because he has been
threatened with retaliation or because he is overwhelmed with
fear and dismay. He also may not trust anyone to tell his tales.
Remember that he told his story when accompanied by Carolee
Weller, the person he loves "best in all the world." He
developed great rapport with Dr. Sexton, something that has not,
by her own admission, occurred with ms. Steiker. He may not
trust Ms. Steiker even though he has met with her many times, as
he may feel that she is not on his side, or he may simply be
unable to talk to her. Frankly, I do not know that I would trust
Ms. Steiker if I were a child since she does not seem to know the
cardinal rule of child therapy: very young children do not talk
very often and they do not respond usually to persistent,
repetitive questioning. I know that Ms. Steiker sees herself as
an expert in child abuse, but I do not know if she has had much
experience in treating very young children. In addition,
Christopher may have picked up on her bias, or he may have been
threatened by the Moons or Ms. Dufy with severe punishment if he
told.


*In the movie Ghostbusters, a team goes out to rid the city of
frightening evil ghosts. The Moons appear as the ghosts he is
trying to evade and destroy.

-7-

I also feel strongly that Christopher should return immediately to the Wellers.  That is more important than anything else that could happen.  He will need therapy for his post-traumatic stress disorder, but that is secondary to his need for reunion with his psychological parents, the Wellers.  If he is not returned to them, I fear he will be permanently damaged psychologically and suffer  a serious depression of childhood or even a conduct disorder.  With return, I think he can make a good recovery as he is well endowed, and was a healthy child prior to June 12, 1991.  I saw nothing in the record to make me think that he was anything but a healthy, normal child psychologically while in the Wellers' care.*

I do not feel that the Moon family or Crystal Dufy should ever have any access to Christopher as the chances for repeat abuse are excellent unless they as a family really respond to treatment.  I am not sanguine about their ever responding to treatment as many efforts have been made to help them in the past without success.  Some people are, unfortunately, irredeemable. I also wonder whether they have abused their other children. Investigation of this possibility is very important.  I do not believe that this child should ever be placed with Ms. Dufy again as I strongly suspect that she also abused him.  I also cannot believe that he could be safe in her house, as it is likely that she is in league, and overly identified with her twin sister, Pearl Moon.  I do not believe she could or would deny access to the Moons, and being in their presence would be traumatic to this child, as she probably behaved in a similar way.

In addition, Christopher has told Dr. Sexton repeatedly that he does not like her and does not like living with her.  He also has begged consistently that he be returned to the Wellers.  His inability to voice any consistent or understandable opinion to Ms. Steiker is not significant.  I must attribute this to his lack of trust of Ms. Steiker, the Moons, and Crystal Dufy and his fear of all of them.

Summary:
I recommend strongly that the court return Christopher to the Wellers immediately and that he be placed in treatment for his evident post-traumatic stress disorder and depression.  The treatment should take place in Tennessee and involve the Wellers.

I do not think he should be forced to see the Moons or Crystal Dufy again as I think visitation would only reopen the wound that this trauma has created.  With luck, psychotherapy, and most important, the good care of the Wellers, I have every

*Social work case notes confirm this as they confirm his having bonded to the Wellers not the Moons.

-8-

reason to think this child will recover. If he does not return to the Wellers, I fear that he will be permanently and sadly affected.

I am grateful to have played a part in this case.

Sincerely,

*Eileen Bazelon, MD*

Eileen Bazelon, M.D.

-9-

Addendum:
    Eileen Sexton was never allowed to present all of her
findings to the court.  She presented a five minute summary of
her report on June 26, 1991.  She was never called again despite
the fact that she asked repeatedly to testify.  She was not able
to tell the judge that Christopher had said that Crystal Dufy had
molested him.  She sent copies of her report to The Honorable
Esther Sylvester, DHS, and Val Jones.  She told Val Jones and
Michael Lewis of her findings.  No one ever contacted her in
response to the report.

                                    Eileen Bazelon MD
                              Eileen Bazelon, M.D.

EB/dfw
1/13/92

# EXHIBIT "B"

EILEEN A. BAZELON, M.D.
THE CAMBRIDGE. APT. 105
2967 SCHOOLHOUSE LANE
PHILADELPHIA. PENNSYLVANIA 19144

TELEPHONE 844-2333


January 15, 1992


Ms. Majorie Greenfield
Anderson & Greenfield
1025 Penn Mutual Tower
510 Walnut Street
Philadelphia, PA  19106-3610

Dear Ms. Greenfield:

I am writing this in response to your question about what my recommendation would be for Christopher Moon's disposition even if he had not been abused by members of his biological family.

I feel strongly that Christopher should return to the Wellers as they are his psychological parents.  In his own six year old way, he has made abundantly clear to Dr. Sexton that he loves them, wants to live with them, that they, to him, are his parents rather than the Moons.  He stated that he was changing his name to Chris Weller.  He begged repeatedly over the course of several interviews to go back to them.

In contrast, he expressed only fear and anger towards the Moons.  He never asked to live with them nor did he say he did live with them.  He never expressed any affection toward them or said they cared about him. That statement could also be made of Crystal Duffy whom he characterized as "mean", and said, only "I hate being there."

If Christopher is not returned to the Wellers, he will suffer post-traumatic stress disorder and a serious depression of childhood, from which he probably will not recover, or at the least, be will be permanently damaged.

My conviction that the Moons and Ms. Duffy have abused him sexually only strengthens my conviction that he should return to the Wellers.  The underlying issue is that Christopher is bonded to his foster family; to him, they are his only family.

Please call me is you have further questions.

Sincerely,

*Eileen Bazelon, MD*

Eileen Bazelon, M.D.

RECEIVED JAN 1 6 1992

EXHIBIT "C"



MICHAEL CHURCHILL
CHIEF COUNSEL

JEROME BALTER
KAREN L. BLACK
THOMAS K. GILHOOL
JUDITH A. GRAN
FRANK J. LASKI
LISA MILLETT RAU

JOHN P. STEVENS III
DIRECTOR OF DEVELOPMENT

PUBLIC INTEREST LAW CENTER OF PHILADELPHIA

125 S. 9th ST., SUITE 700, PHILA., PA 19107          215-627-7100

EDMUND B. SPAETH, JR.                    EDWIN D. WOLF
CHAIRMAN OF THE BOARD                    EXECUTIVE DIRECTOR
                                         1974-1976

**HAND DELIVER**

February 13, 1992

Ellen Greenlee
The Defender Association of Pennsylvania
121 North Broad Street
Philadelphia, PA 19107

Dear Ellen:

I am writing again because I have had no reply about some of the important issues I raised in my last letter. I want to make clear that I regard the actions of one of your attorneys as one of the most serious breaches of professional responsibility that I have seen  and I believe it raises serious issues not only about the ethics of the attorney but about training and supervision.

First, Bill Norvell did call to tell me that because of a conflict within the office about what position to take, the Defender was withdrawing as the child's counsel. Subsequently my co-counsel was told the Defender's office did not want to have to cross-examine its own expert, Dr. Sexton. When Dr. Sexton (who was not told about the January 29th hearing until January 27th) was not called to testify, Ms. Jones decided she could continue to participate and attempt to prevent Christopher from being reunited with his long-term (from 2 months old to 6 years old) foster parents. Ms. Jones continued to take that position even after hearing the testimony of Dr. Bazelon as to the damage and injury to the child.

I must say I don't understand what lawyers are doing in deciding the factual issue of a child's needs when they reject their own experts statements and those of the only other experts consulted. Are Ms. Jones and Mr. Norvell that much more knowledgeable than Drs. Sexton and Bazelon? Are they relying on anyone other than themselves?

This is not a small matter because either Ms. Jones and Mr. Norvell have concluded factually that their client has not been injured by the events of this year, or they regard the injury as legally not determinative of what should happen to him. Since I think we would both agree that if the child is being injured by what is happening it is the Defender's duty to persuade the Court not to allow it -- and since Ms. Jones and Mr. Norvell have not

RECEIVED FEB 13 1992

Ellen Greenlee
February 13, 1992
Page 2

done that -- I have to conclude they believe he was not being injured.  Again, I must ask, on what evidence?

But that is secondary to the breaches of responsibility to the child and to the Court which occurred:

1.    Ms. Jones has continually misrepresented Dr. Sexton's position.   Dr. Sexton asked to testify on July 8th and Ms. Jones told her she could not.   She continued to state her desire to testify and Ms. Jones told the Court repeatedly that she did not wish to testify and had "nothing more to say".   She repeated this again during the last week of January.   It is utterly untrue, as demonstrated by the fact that she also stated that she did not want to be in the position of having to cross-examine her own expert. Presumably Dr. Sexton wanted to say things different from what the Court had already heard and what Ms. Jones wanted the Court to know, otherwise why would it have been necessary to cross-examine her?  Ms. Jones represented it was "all in Dr. Sexton's report" but in fact Dr. Bazelon testified about other information not included in the report, for example how Christopher clung to her secretary and did not want to leave the office with his aunt.

2.    Ms. Jones did everything she could to deny Dr. Bazelon access to Dr. Sexton and to Dr. Sexton's notes.   Was this considered to be in the best interest of the child?   Or was this a ploy so that evidence would not be available to the Court appointed expert?   Surely she knew that they contradicted her own statements.

3.    Although Judge Sylvester told Ms. Jones in December that she wanted Dr. Sexton to testify and although Ms. Jones asserted Dr. Bazelon could not testify until Dr. Sexton testified as to the circumstances of the visits and drawings, Ms. Jones never notified Dr. Sexton of the January 29th hearing until two days before.   The date of the hearing had been set in December.

4.    Ms. Jones never informed the Court at the December hearing that Christopher's school had referred him to The Children's Crisis Treatment Center because of the severity of his behavior problems and never revealed the existence of a psychological report or of the treatment.   Ms. Jones permitted witnesses who knew of this situation to testify that Christopher was improving and adjusting when she and they had access to the information demonstrating that it was not true.   She made no attempt to ask any witness who should have known about this information about it.   She then sought to deny Dr. Bazelon access to these reports.   Dr. Bazelon testified that this information was important in her assessment of the child.

Ellen Greenlee
February 13, 1992
Page 3

5. The therapist, Ms. Sandra Steiker, had notes which indicated Christopher's continual requests to go back to Tennessee and his foster parents. She didn't report this and Ms. Jones did not ask about it -- either because she did not want to bring this out or because she had not examined the notes and was not prepared to cross-examine the therapist on behalf of her client.

No matter what view an attorney may have as to the standing of foster families, I cannot imagine how it excuses such conduct. It is not for me to speculate why this occurred and why Mr. Norvell permitted it to continue, but I believe it is my obligation to bring it to your attention and yours to find out why it happened and how to prevent its reoccurrence. I have not determined whether this requires a referral to the disciplinary board. Suppression of evidence of this sort is particularly grave when the client, a child, has no effective say in directly controlling his attorney or making his desires known except through evidence permitted by his attorney. The attorney's obligation to have all information presented to the Court is compounded because the law makes information about the client confidential in order to protect the client; here the attorney actively used that confidentiality as a way not of protecting her client but to suppress admissible and highly relevant evidence about that client's wishes and needs from reaching the Court.

Finally, I would like to remind you that this is the second time that I know of in which your office has failed to understand and therefore to vigorously act to protect an infant's attachment to psychological parents. I had hoped after the first instance some discussion and training would occur. The first time there was no question that there was a difference in judgment, albeit without any attempt by the unit to consult any professionals. This second time is more upsetting because not only does it involve the same problem of not recognizing a child's needs but adds the element of ignoring professional advice and deliberate deception and hostility. And then to make it worse, once the child made allegations (in a manner which all three "experts" consulted -- Dr. Bazelon, Dr. Sexton and Ms. Steiker -- believed were true) of sexual attacks by three members of his natural family your office continued to support unsupervised visits with those family members and an eventual return home. It appears to me there are substantial training needs in these areas which I would be glad to discuss with you.

Because of the seriousness of these matters and the inadequate response by Mr. Norvell last time, I would suggest that you speak personally to Dr. Sexton. I am not familiar with what procedures

Ellen Greenlee
February 13, 1992
Page 4


your office utilizes in conducting impartial investigations to examine conduct of attorneys but this matter goes far beyond any issue of whether I disagree with Ms. Jones on what is best for a particular client but to the way the child advocate unit attorneys conduct their business, and the nature of their obligation to client and court.

I am not copying Ms. Jones or Mr. Norvell but will leave it to you as to how you wish to keep them informed.  I am available to meet with you to discuss this matter in person if you wish.


I am sorry to have to renew this matter and I await your reply as to how you will proceed.

Sincerely,

Michael Churchill

MC:lr

cc:  Marjorie E. Greenfield, Esquire
     Edmund B. Spaeth, Jr., Esquire

EXHIBIT "D"

# DEFENDER ASSOCIATION
## OF PHILADELPHIA

121 NORTH BROAD STREET
PHILADELPHIA, PA. 19107-1913
(215) 568-3190
FAX NO. (215) 557-5004

**ELLEN T. GREENLEE**
DEFENDER

March 13, 1992

Michael Churchill, Esquire
Chief Counsel
PILCOP
125 S. 9th Street
Suite 700
Philadelphia, PA  19107

RE:  CHRISTOPHER MOON

Dear Mike:

I write in response to your letters of January 22, 1992 and February 13, 1992 in which you raise issues regarding the representation of Christopher by our Child Advocacy Unit.

I have spent considerable time meeting individually and jointly with Bill Norvell, Shawn Lacy, Val Jones, Eileen Sexton and Michael Lewis.  During the course of these meetings we have identified and addressed many issues including: the law as viewed from the perspectives of the child, the natural parents and the foster parents; the child's welfare with respect to psychological bonding and separation trauma; the respective roles of child advocate attorneys and child advocate social workers; and the weight to be given an expert's opinion.  Additionally, I have reviewed notes of testimony, reports by Dr. Sexton and by Dr. Bazelon, and the history of Christopher's case.

I would like to preface my comments by stating that Christopher's life-long involvement with the dependency system presents an extremely complicated factual situation replete with both legal and ethical issues.

In looking at the tortuous path Christopher has traveled just since June 26, 1991, it is apparent that the matter could have been handled in a manner more consistent with Christopher's needs.  With the benefit of hindsight, it is safe to say that Christopher should not have been suddenly removed from the Wellers and placed with his aunt.  Following his placement with

Michael Churchill, Esquire
March 13, 1992
p. 2

his aunt, it does appear that Val Jones chose to rely on the re-
ports of Sandra Steiker, the child's therapist, and did not rely
on Dr. Sexton's reports.  Likewise, Judge Sylvester apparently
did not rely on Dr. Sexton's reports.  I am satisfied, however,
from my investigation, that Ms. Jones did not withhold informa-
tion from the court.  I am equally satisfied that Ms. Jones did
not misrepresent Dr. Sexton's position to the court or attempt to
prevent Dr. Sexton from testifying.  My review of the notes of
testimony, and my conversations with Dr. Sexton support this po-
sition.

My greatest concern regarding the developments of
Christopher's case is that, perhaps, the welfare of the child was
not given the attention and weight that it merited.  It may well
be that there was too much involvement in other less important
issues, and too much pointless debate over the adult concepts of
the rights of biological parents versus those of foster parents.
I have taken actions to ensure for the future that this will not
happen again.

Sincerely,

*Ellen*

ELLEN T. GREENLEE
Defender

ETG/lk