Gregory G. Stagliano, Esquire
Atty # 33185
**GREGORY G. STAGLIANO, P.C.**
344 West Front Street
Media, PA  19063
(610) 566-9200

Attorney for Plaintiff
Christopher J. Weller

| | |
|---|---|
| CHRISTOPHER J. WELLER | IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA |
| Plaintiff | |
| v. | |
| CHERYL RANSOM-GARNER COMMISSIONER, PHILADELPHIA DEPT. HUMAN SERVICES | NO. 05-2758 |
| and | |
| VALERIE JONES | CIVIL ACTION |
| and | |
| DEFENDER ASSOCIATION OF PHILADELPHIA | PROFESSIONAL LIABILITY ACTION |
| and | |
| CITY OF PHILADELPHIA | |
| Defendants | |

## PLAINTIFF'S REPLY TO THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS, VALERIE JONES, ESQUIRE AND DEFENDER ASSOCIATION OF PHILADELPHIA

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Admitted in part.  Denied in part.  Not only was Christopher Weller removed from his birth parents due to abuse and neglect, he was also immediately placed into the foster care of Bill and Carolee Weller where he remained happily for six years.

6.      Admitted.

7.      Admitted.

8.      Admitted in part.  Denied in part.  Plaintiff specifically, vehemently objects to the apparent attempt to characterize the only parenting problems of Pearl and James Moon as economic.  To the contrary, the evidence will show that they were abusive and neglectful; that Mr. Moon spent more than a brief time in prison, and that the Moon family is still, to this day, a resident of the City of Philadelphia's Department of Human Services.  See excerpts from the deposition of Mary Handy, DHS case worker, which are attached collectively as Exhibit "A".  (Even Ms. Handy was afraid of Mr. Moon!)

9.      Denied.  The documents speak for themselves; however it is specifically disputed that entries in the documents which comprise Defendants' Exhibit "E" are complete and accurate and strict proof is demanded.

10.     Admitted in part.  Denied in part.  It is admitted that, after 1987, the Wellers communicated to DHS their desire to adopt Christopher and that DHS, with knowledge of this fact, did absolutely nothing to further that goal but instead, precipitously and without warning ripped Christopher from the Weller's loving home in mid 1991 and placed him with total strangers of whom he was terrified.

11.     Admitted in part.  Denied in part.  While the document says what is indicated, the problem for both Defendants is that it contains faulty information which highlights the abhorrent treatment this child was given.  The fact is that the Wellers were separated for a brief time in 1989, some one and a half to two years before the time indicated.  By 1991 they were a happily married couple as they remain today.  It is a matter of fact for the jury to assess why

2

neither DHS or Ms. Jones and the Defender Association had their facts straight.  It is also directly relevant to the negligence of Ms. Jones in that she testified during her deposition that a part of her decision making was based upon her mistaken belief that the Wellers were separated at the relevant time.  See deposition of Valerie Jones attached hereto as Exhibit "B", page 28.

12.     Admitted in part.  Denied in part.  While the facts as stated are admitted, the significant question of fact is what Christopher and Bill and Carolee Weller knew at the time they returned to Philadelphia.  To the contrary it was their understanding that they were returning to Philadelphia to begin the process of adopting Christopher.  See Affidavit of Carolee Weller attached as Exhibit "C".

13.     Admitted in part.  Denied in part.  It is admitted that initially Christopher was living with his biological family until such time as his complaints of mistreatment there had the Judge order him removed and placed with a maternal aunt.

14.     Admitted.

15.     Admitted.

16.     Admitted.  Since Defense counsel, herein, admits that there are numerous factual questions in dispute, this admission, alone, mandates the dismissal of this Motion.

17.     Admitted.

18.     Admitted.

19.     Denied.  It is both denied that the criticisms contained within Ms. Knight's report are unsupported by the laws of this Commonwealth and/or that the facts of this case do not support the negligence theories adequately to survive the instant Motion and strict proof is

required. To the contrary, with due respect to the assertions of Defense counsel, the necessary elements to sustain a legal malpractice claim are all contained within the four corners of Ms. Knight's report.

20.     Denied.  The allegations of this paragraph are denied as conclusions of law to which no response is required. However, by way of further answer, it is inaccurate to say that a violation of ethical obligations may not serve as the basis from which a legal malpractice claim may arise. These issues are fact dependent and may not be dealt with in a Motion context.

21.     Denied.  The record is well documented and, the facts expected to be developed during trial, will bear out the fact that Defendant, Valerie Jones, Esquire, had drawn upon personal prejudice to "pick and choose" amongst various professionals in deciding whose opinions to consider and whose to ignore.  The facts will also bear out that she intentionally attempted to manipulate the appearance of witnesses and thus, the evidence presented to the Judge.  In support of these statements, see the letters from Michael Churchill, Esquire attached as Exhibit "D" and the excerpts of Ms. Jones' deposition transcript attached as Exhibit "B". More importantly, however, is the fact that these are all questions of fact that are clearly in dispute and, as such, Summary Judgment is inappropriate.

22.     Denied.  It is denied that any aspect of Plaintiff's theory of liability against Moving Defendant is based upon a failure to support the rights of the Wellers as foster parents. To the contrary, Plaintiff concedes that, at the time, as opposed to now when the right of a foster parent to be heard is codified in statute, foster parents had no "rights".  What Plaintiff simply contends is that, given the overwhelming attachment that had formed between Christopher and the Wellers, given the length of time he had spent with them (his entire life),

and given the alternative … the Moons, that any competent attorney who actually had the best interests of this particular client in mind would have wanted to hear from and interact with the Wellers. She should have wanted to do that both to form a judgment in her own mind as to whether the Wellers presented the better alternative for the child and also to insure that the Court had fair access to them to allow the Judge a better opportunity to decide for herself. Vehemently objecting to the Wellers participating in the proceedings did not suit that purpose. Further, Moving Defendant did not even speak to the Wellers to formulate her own judgment as to their suitability. How can any competent legal professional argue that this conduct met even minimum levels of professional standards?

23.    Denied. See reply to Paragraph 22 above. By way of further answer, Plaintiff is not and has never alleged that Moving Defendant owed any "legal duty" to the Wellers. To the contrary, she owed it to her client, the six year old little boy who had spent his entire life with them, who loved them, who had clearly bonded with them as parents, and who had constantly expressed his desire to live with them to, at least, involve them in the process so that their suitability could be properly assessed. To the contrary, the record will clearly show that not only did the Moving Defendant do everything humanly possible to try and keep the Wellers out of the process but she also, unbelievably, refused to support them as a viable alternative to the Moons even when numerous health care professionals testified that it was dramatically in her young client's best interests that he be returned to them!

24.    Denied. While it is admitted that the Child Advocate may not have had an equal position with DHS regarding standing to bring a termination petition, there is nothing anywhere in the record to suggest that Moving Defendant ever reversed her stubborn and blind opposition

5

to the Wellers which shows conclusively that her representation of this child was severely compromised.

25.    Admitted in part.  Denied in part.  While no one can say with one hundred percent certainty what the Judge would have done, this is no different than a medical malpractice case wherein increased risk of harm is the standard.  The analysis is analogous but not identical. The legal and factual question which can only be answered by an expert is whether, in the opinion of the legal expert in these matters, the Judge would have considered the evidence if properly presented and advocated by the Moving Defendant and rendered a different decision or, in the alternative, whether the failures of the Moving Defendant increased the likelihood that the Judge would do the wrong thing and thus cause the harm sustained.  Further, respectfully, this Court can and should take judicial notice of the fundamental concept that intentionally denying a trial judge relevant evidence helpful to your client's cause is actionable legal malpractice.

26.    Admitted in part.  It is admitted that Ms. Kanter's opinion generally supports the actions of the Defendant, Jones, however with due respect to Ms. Kanter, her credentials pale in comparison to those of Ms. Knight who not only was a high ranking member of Delaware County Children and Youth Services but also has been an attorney with a practice limited to this particular specialty for many years.  She also continues to remain a licensed social worker in the Commonwealth of Pennsylvania.  See her C.V. which is attached hereto as Exhibit "K". Also, the factual bases for Ms. Kanter's opinions are subject to serious question and will be aggressively challenged at time of trial.  Also, it needs to be noted that not only is Ms. Jones a Defendant but also is her employer, The Defender Association.  Independent of her errors,

there is also the failure of anyone at the Association to deal with the allegations which were made against Ms. Jones at the time of these events.

27.     No response required.

WHEREFORE, Plaintiff respectfully requests that the Motion of the Moving Defendants be denied.

LAW OFFICES OF GREGORY G. STAGLIANO, P.C.

GREGORY G. STAGLIANO, ESQUIRE
Attorney for Plaintiff, Christopher Weller

DATED:

7

**Gregory G. Stagliano, Esquire**
Atty # 33185
**GREGORY G. STAGLIANO, P.C.**
344 West Front Street
Media, PA  19063
(610) 566-9200

Attorney for Plaintiff
Christopher J. Weller

---

| | | |
|---|---|---|
| CHRISTOPHER J. WELLER | : | IN THE UNITED STATES |
| Plaintiff | : | DISTRICT COURT FOR |
| v. | : | THE EASTERN DISTRICT OF |
| | : | PENNSYLVANIA |
| CHERYL RANSOM-GARNER | : | |
| COMMISSIONER, PHILADELPHIA | : | NO. 05-2758 |
| DEPT. HUMAN SERVICES | : | |
| and | : | |
| VALERIE JONES | : | CIVIL ACTION |
| and | : | |
| DEFENDER ASSOCIATION | : | PROFESSIONAL LIABILITY ACTION |
| OF PHILADELPHIA | : | |
| and | : | |
| CITY OF PHILADELPHIA | : | |
| Defendants | : | |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF DEFENDER ASSOCIATION AND VALERIE JONES, ESQUIRE FOR SUMMARY JUDGMENT

## I.    COUNTER STATEMENT OF FACTS

The legal malpractice defendants seek to misstate many irrefutable facts that, interestingly, aid in the proof of Plaintiff's malpractice claim.

For example, Moving Defendant on the second page of their Factual Background simply want to paint a portrait of Mr. and Mrs. Moon as "poor people" who simply could not afford to deal with the medical problems of their infant son, Christopher.  Such characterization could not be farther from the truth but the mis-characterization is extremely relevant.

In the Dependency Petition which is included in Defendants' Exhibit packet but which is also attached hereto and incorporated herein as Plaintiff's Exhibit "J" the record is clear. Christopher is described by the physician as "malnourished" with pneumonia. His mother's actions are described as "she failed to provide the child with the necessary medication and shook the child violently in the emergency room". The doctor felt that "he would be at definite risk if returned home". See also Affidavit of Carolee Weller attached hereto as Exhibit "C".

Moving Defendant also fails to mention that the Moons lost all of their children to foster care and in the deposition testimony of DHS social worker, Mary Handy, that the Moons were still noted as an open case file at DHS. Further, Ms. Handy noted that Mr. Moon was later jailed for serious crimes in Mary Handy's deposition attached hereto and incorporated herein as Plaintiff's Exhibit "A".

The Moving Defendant also failed to note that, unbelievably, the Dependency Review Orders attached as Exhibits to Defendants' Motion reveal that the goal for Christopher was changed to adoption on January 13, 1989. See Plaintiff's Exhibit "E" attached hereto and incorporated herein.

Nothing at all, however, was done to advance that goal even though it is noted that a representative of the Defender Association or Ms. Jones was usually present at these hearings. The next reference to adoption appears on April 2, 1990 but again nothing is done. See Plaintiff's Exhibit "F".

In January of 1991, DHS misrepresented to the Court that the Wellers were separated and, for the first time, questioned the adoption goal. See Plaintiff's Exhibit "G" and "C" attached hereto and incorporated herein.

In March of 1991, the Wellers appeared in Court together united and requested and were granted the ability to move Christopher to Tennessee with them.   See Exhibit "C".

Then inexplicitly on May 30, 1991 without explanation, rhyme, or reason, Christopher was abruptly removed from the only parents he ever knew and visits were immediately commenced with the biological strangers with whom he had had very limited contact.   See Exhibit "H" and "C" attached hereto and incorporated herein.

Valerie Jones had been Christopher's child advocate since 1986.   At that time she had approximately five hundred clients within the office.   She and the Defender Association were thus charged with representing their child client with the fiduciary zeal an attorney's representation requires.   Thereafter, Ms. Jones adopted the position, presumably on behalf of her client, that can best be described as antagonistic and adversarial to the Wellers and their counsel, Ms. Greenfield, but nothing else.   Beyond that it is difficult to ascertain exactly what position Ms. Jones "advocated" on behalf of her six year old client.

The record is clear.   Despite the very brief excerpts of the transcript that were appended to Defendant's Motion, Ms. Jones asserted every obstacle that she could in the path of any evidence that could be described as favorable to the Weller's cause.

Dr. Eileen Bazelon, a psychiatric expert, felt so strongly about it that she authored an addendum to the Court documenting how Dr. Sexton was thwarted by Ms. Jones in her attempts to speak to the Court.   See Exhibit "I" attached hereto and incorporated herein.

Interestingly, both Dr. Bazelon and Dr. Sexton overwhelmingly favored a return to the Wellers for Christopher.

3

Ms. Jones also ignored the opinions of Kathryn Melot, the CONCERN social worker who had had the most direct contact over the years with Christopher, the Wellers, and the Moons. Ms. Jones dismissed her because "she had an agenda". See deposition of Valerie Jones attached hereto and incorporated herein as Plaintiff's Exhibit "B", at page 25.

The actions of Ms. Jones were partially summarized by an independent third party, Michael Churchill, Esquire, of the Public Interest Law Serve of Philadelphia in two letters he sent to Ellen Greenlee, Esquire, then and current head of the Defender Association. See letters of Michael Churchill attached hereto and incorporated herein as Plaintiff's Exhibit "D". Despite these issues the Defender Association did nothing to remedy the situation.

Finally, on January 29, 1992, Judge Sylvester ordered Christopher returned to the Wellers. She did so on the basis of all the uncontradicted testimony that was finally presented to her through the perseverance of the Wellers and their counsel only.

## II.   LEGAL ARGUMENT

### A.   Argument Regarding Rules of Professional Conduct

It is well settled law in every jurisdiction that attorneys owe their clients a fiduciary duty. "The attorney stands in a fiduciary relationship with the client and should exercise professional judgment solely for the benefit of the client and free of compromising influences and loyalties." Office of Disciplinary Counsel v. Monsour, 549 Pa. 482, 486, 701 A.2d 556 (Pa. 1997).

While Plaintiff's counsel agrees that an instance of a violation of the Rules of Professional Conduct does not, in and of itself, constitute legal malpractice certainly such a violation can amount to legal malpractice if the conduct, in the opinion of a legal professional, which constitutes the violation also rises to the level of a breach in the lawyer's duty of

4

professional care.  In other words, calling the actions of an attorney a breach of the rules does not insulate an attorney from liability solely by virtue of that fact.  That would be ludicrous.

To the contrary, a tort action may be maintained for an act which constitutes a breach of fiduciary duty and negligence even though those acts will also be violations of the Rules of Professional Conduct.  <u>Maritrans G.P., Inc. v. Pepper, Hamilton & Scheetz</u>, 529 Pa. 241, 602 A.2d 1277 (1992); <u>Destefano & Associates v. Cohen</u>, 2001 Phila. Ct. Com. Pa. LEXIS 20 (2001).

Ms. Knight's sole reference to the Rules of Professional Conduct appears in her report at Item 2 of six specifically listed criticisms.  In that rather innocuous comment, she simply states that Ms. Jones compounded an already existing DHS error by failing to abide by the ethical rule that requires independent, zealous advocacy on behalf of her client.

That Rule is the broadest of all ethical Rules and is arguably implicated in every case of legal malpractice that has ever been asserted.  To say that a violation of this Rule cannot serve as a basis for a legal malpractice claim would be to virtually eliminate legal malpractice claims.  Ms. Knight's report goes on to clarify her statement by saying that Ms. Jones' conduct was deficient in that she seemed to blindly follow the DHS recommendations without ever formulating her own independent judgment as is the duty of every attorney in every case.  For this reason Defendants' argument fails.

B.      <u>Argument Regarding Failure to Produce Evidence</u>

It is abundantly clear that this entire portion of Defendants' Motion is factual argument, not legal.  Not only is the argument factual but it is based, almost entirely, upon assumptions of fact supposedly gleaned by the Defendants' expert witness, Nancy Kanter, Esquire.  Such can

never be the basis for a grant of summary judgment.  Not only is this portion of the argument not limited to specific excerpted portions of an uncontradicted record, but rather it comes from a third party, i.e. the professional witness.

However, it should be noted that since Moving Defendant's argument on this issue is solely factual one must logically conclude that Moving Defendant concedes the legitimacy of the legal theory behind this aspect of Plaintiff's case.   It is certainly not subject to serious dispute to say that an advocate for a child who intentionally seeks to hide relevant evidence from the Judge is guilty of a breach of their professional duties.

Since the dispute is purely factual, summary judgment cannot be granted.  However, to the extent it is necessary to respond to the factual arguments made by Moving Defendant, with due respect to Ms. Kanter, Plaintiff will call Ms. Greenfield at the time of trial.  What she witnessed of Ms. Jones' conduct is partially summarized in the letters of Mr. Churchill that have previously been referenced and attached as Exhibit "D".

There are references in the sworn testimony also that has, of course, been ignored by Ms. Kanter wherein professional witnesses advised that Ms. Jones did not give them adequate notice of the hearing or attempted in other ways to limit their testimony.  See Valerie Jones deposition at pages 95 & 96, attached as Exhibit "B".   Ms. Jones was also more obsessed in one instance with protecting the file of a certain witness than she was about protecting her client.

Plaintiff is confident that the record will more than support Plaintiff's contention that it was Ms. Jones who had an "agenda" which was completely unrelated to the best interests of her client.  This Court need only to look at the Addendum note of Dr. Bazelon, previously referenced and attached as Exhibit "I", as some testament to the factual dispute surrounding Ms.

6

Jones' conduct even back at that time or, more poignantly, look at pages 27 through 29 of her May, 2007 deposition and compare that to the stated facts in Carolee Weller's Affidavit which is attached as Exhibit "C". Obviously, Mr. and Mrs. Weller are in a better position to accurately testify as to the state of their marriage in May of 1991 yet Ms. Jones cavalierly misstates the facts but confesses that those misstatements were the bases for her actions as Christopher's attorney.

Given that this entire argument is factual, summary judgment is clearly inappropriate.

C.    Argument Regarding Standing of Foster Parents

Respectfully, it is irrelevant to any part of this discussion that foster parents had no legal standing to intervene into an action involving their foster children back in 1991. Plaintiff has never argued to the contrary nor does Ms. Knight in her expert report.

Given that this quintessentially normal, nice, middle class couple had raised her six year old client since infancy, however, would have caused any normal, competent attorney to want them to participate in the hearings in some way. Judge Sylvester clearly bent over backwards to grant the Wellers some status and ultimately declared them to be "friends of the Court". It is extremely clear from the transcript that had Ms. Jones not vehemently objected the Court would likely have granted them standing irrespective of the law at that time. Logically, would it not have made sense for the psychological parents of the child to have been allowed a say in the child's future? From a legal standpoint, there is no affirmative duty on the part of an attorney to raise legal issues adverse to your client's interest.

7

When Ms. Jones was deposed and asked over and over again why she continuously objected to the Weller's standing, her nonsensical persistent response was "foster parents do not have standing". She never once articulated a reason related to her representation of this client as to why she opposed their standing in this case. This one issue alone, which is confirmed by her deposition responses, shows just how far below minimum standards of professional conduct that she operating at that time. See deposition pages 64 - 72 of Valerie Jones attached hereto and incorporated herein as Plaintiff's Exhibit "B".

Failing to articulate any other reason for taking such a strong position in Court on an issue that ultimately is proven to have been against your client's best interests is per se malpractice. Clearly, Ms. Jones acted as if she were part of some abstract process; someone desperately needed to tell her that she was supposed to be an advocate for Christopher Moon. She was not a judge or a law school professor in court on those occasions. The only reason for her to have done anything, said anything, or intentionally not said or done anything was for some calculated reason designed to further her client's interests. Nothing else serves as an excuse for the action or inaction of an advocate.

Wherefore, as to this issue Defendants' Motion fails.

D.    Argument Regarding Termination of Parental Rights

The report of Carlin Knight, Esquire does not state that the child advocate had the unilateral authority to terminate parental rights but where was the advocacy anytime from January of 1989 to today for this child? In January of 1989 the goal was supposedly changed to adoption. Not once thereafter did the child advocate ask, seek, urge, cajole, anything the Court to terminate the rights of the biological parents.

Adoption is, of course, a two step process:  Terminating the rights of the biologicals and then establishing the rights of the adoptive.  Once an adoption goal was articulated the child advocate should have been all over DHS as to why the rights were not being terminated.  Instead the advocate then and in 1990 and in 1991 and 1992 did nothing except in 1991 when Ms. Jones decided that she would fight with Ms. Greenfield over anything or anyone that supported the Wellers.

It is this lack of affirmative action on the part of the advocate, Defender Association, that serves as the partial basis for Plaintiff's theory of liability against them.   The Defender Association and Ms. Jones seemed to have taken a position of blind bystander as opposed to advocate in any way shape or form and for this reason Defender Association's Motion regarding this issue must be dismissed.

E.     Argument Regarding Judge Sylvester's Decision

The opinion of Ms. Knight is just that, the opinion of a legal expert with significant experience in the field regarding what she believes would have occurred but for the negligence of the Defendant.  That opinion is a required part of any professional malpractice case.

In any professional malpractice case Plaintiff's expert must testify to a reasonable certainty as to the standard of care, as to the fact that the Defendants' conduct fell below that standard, and as to the fact that the result in question came from the cause alleged.

No one knows what Judge Sylvester would have done had the Defendant done her job competently because that did not happen.  Therefore, the Plaintiff is required to have an expert render an opinion to a reasonable degree of professional certainty as to what would have happened had the malpractice not occurred.  That is exactly what Ms. Knight will do at time of

9

trial and therefore this cannot serve as the basis for a summary judgment motion.

Further, since this issue as raised by the defense in this motion speaks directly to the proximate cause component of Plaintiff's case, proximate cause is always a trial issue and is never properly the subject of a summary judgment motion.  For further elaboration on this issue please see Plaintiff's Reply Memorandum to the City of Philadelphia's Motion which raised the identical Issue. Therefore, as to this issue as well Moving Defendants' Motion must be denied.

Respectfully submitted,

LAW OFFICES OF GREGORY G. STAGLIANO, P.C.

GREGORY G. STAGLIANO, ESQUIRE
Attorney for Plaintiff, Christopher Weller

| | | |
|---|---|---|
| CHRISTOPHER J. WELLER | : | IN THE UNITED STATES |
| Plaintiff | : | DISTRICT COURT FOR |
| v. | : | THE EASTERN DISTRICT OF |
| | : | PENNSYLVANIA |
| CHERYL RANSOM-GARNER | : | |
| COMMISSIONER, PHILADELPHIA | : | NO. 05-2758 |
| DEPT. HUMAN SERVICES | : | |
| and | : | CIVIL ACTION |
| VALERIE JONES | : | |
| and | : | |
| DEFENDER ASSOCIATION | : | PROFESSIONAL LIABILITY ACTION |
| OF PHILADELPHIA | : | |
| and | : | |
| CITY OF PHILADELPHIA | : | |
| Defendants | : | |

## **VERIFICATION**

Gregory G. Stagliano, Esquire, verifies that he is the attorney for Plaintiff, Christopher J. Weller, in this action, and that the facts set forth in the foregoing Plaintiff's Reply to the Motion for Summary Judgment of the Defendants, Valerie Jones and Defender Association of Philadelphia, are true and correct to the best of his information, knowledge and belief. It is understood that these statements are made subject to the penalties relating to unsworn falsification to authorities.

_____
GREGORY G. STAGLIANO, ESQUIRE
Attorney for Plaintiff
Christopher J. Weller


DATED:    2/22/08

## CERTIFICATE OF SERVICE

I, Gregory G. Stagliano, Esquire, Attorney for Plaintiff, Christopher J. Weller, hereby state that a true and correct copy of the foregoing Plaintiff's Reply to Defendants, Valerie Jones and Defender Association of Philadelphia's Motion for Summary Judgment, sent by first-class mail, postage prepaid on the date set forth below, was served upon the following:

> J. Michael Doyle, Esquire
> Post & Schell
> Four Penn Center, 14th Floor
> 1600 John F. Kennedy Blvd.
> Philadelphia, PA 19103-2808
>
> Jeffrey S. Simons, Esquire
> Law Department
> City of Philadelphia
> 1515 Arch Street, 14th Floor
> Philadelphia, PA 19102-1595

LAW OFFICES OF GREGORY G. STAGLIANO, P.C.

_____

GREGORY G. STAGLIANO, ESQUIRE
Attorney for Plaintiff, Christopher J. Weller

DATED:   2/22/08

# EXHIBIT "A"

9

1                    Mary Handy
2  them to DHS?
3       A.   No, we did what we doing now.  We
4  purchase services to various agencies.  It
5  depend on the age of the child.  Like,
6  Children's Aid Society basically dealt with
7  younger children.  Southern Homes, at that time
8  they dealt with adolescents.  Women's Christian
9  Alliance, they also dealt with younger
10 children.
11            My caseload at that time consist of a
12 mixture of adolescents and younger children.
13 So my unit had those three agencies.
14      Q.   About how many families would you
15 have in your active caseload back then?
16      A.   During that time when I first arrived
17 at DHS, I had like 201 cases.
18                 MR. FALLON:  I'm sorry?
19                 THE WITNESS:  201.  During that
20      time, the majority of social workers
21      carried between 180 to 200 cases.
22 BY MR. STAGLIANO:
23      Q.   Has that volume changed at all to
24 today?
25      A.   Yes.  They're carrying now up to 30,

1                          Mary Handy
2    31 cases, no more than 31 cases.
3         Q.    And is that for you today as well?
4         A.    I don't care cases anymore, no.
5         Q.    What do you do now?
6         A.    I do central referral.  What I do, I
7    locate placement for children.  I locate what
8    you call treatment foster care.  That's
9    specialized foster homes.
10              I do MR cases where a child -- if the
11   IQ is below 63, I find a specialized foster
12   home for them or we have to place them in MR
13   facilities like the Woods program -- that's in
14   Langhorne -- Brian House and Devereux Kanner.
15   We use those for facilities for kids with MR
16   issues.
17        Q.    How long have you been doing that?
18        A.    About six years, six or seven years.
19   I'm not sure.
20        Q.    Up until that time, six or seven
21   years ago, whatever it was --
22        A.    Before that time?
23        Q.    -- you had a caseload?
24        A.    I carried a caseload.
25        Q.    Six or seven years ago, what was the

1                          Mary Handy
2     size of your caseload?
3          A.    Initially, it dropped from 200 to 86,
4     from 86 to 31 within that time.
5          Q.    The time frame we're talking about
6     here involving the Moon family --
7          A.    Yes.
8          Q.    -- was I guess the mid to late
9     eighties up until I'm interested in 1991.  What
10    was your caseload at that time?
11         A.    82 to 86 cases.
12         Q.    So it had come down from the 180 to
13    200 range?
14         A.    Yes.
15         Q.    Now, while you were employed at DHS,
16    did they give you any additional continuing
17    education, whether they be classes here or send
18    you out?
19         A.    We were mandatory by Harrisburg to
20    have training.  I think we had to have up to 21
21    hours a year.
22         Q.    Is that still the case?
23         A.    Oh, yes.  You have to.
24         Q.    It's like lawyers, like continuing
25    education requirements?

Mary Handy

2  all?

3      A.   I remember the mother, Pearl Moon.  I
4  think that was her name.  I'm not sure.  I may
5  be wrong.  I think her name was Pearl.  The
6  father was James Moon.  And I think I can
7  remember him because he was very hostile
8  towards me.  The mother was a very passive
9  person.  The father was sort of hostile.

10          So I can remember that.  I was
11  frightened a lot of times going to the home.

12      Q.   That was kind of the point of my
13  question.  I was just going to ask you what was
14  your general impression of the parents.  What's
15  your general recollection of them?

16      A.   Both were products of foster care.  I
17  do remember that.  I remember the mother
18  talking to me.  I remember getting her in
19  therapy.  Father, he had started therapy but he
20  wouldn't continue.  Like I said before, he had
21  a background to the point where I would always
22  take somebody out there when I need to meet
23  with both parents.

24          When he wasn't there, I could always
25  go to the home to see the mother.  She was very

18

1                           Mary Handy

2    open to cooperation, cooperating with us.  So

3    that was never a problem with the mother.

4              The father -- I'm trying to remember.

5    That's all I basically remember about the

6    father.  He just didn't cooperate with us.  It

7    was always the mother, working with the mother,

8    working with the mother's attorney, which I

9    think was Bill Gibbons.  The father, I don't

10   remember the father's attorney.  I don't think

11   he had one.  I don't remember that one.

12        Q.    Do you have or recollect when DHS was

13   completely done with the Moon family?

14        A.    We're not done.  She had more kids.

15   I don't have the record.  But I think the

16   record is still open.  I'm not sure.  It may be

17   closed because I think it was two younger

18   children.  I think when I got rid of the case

19   she was pregnant.

20              I think there's two other younger

21   children.  I'm not sure.  But I think it is,

22   because I remember one of my co-workers coming

23   to me and saying that she has my old case and

24   that was last year.  So I think it may still be

25   open.  I'm not sure.

                    Mary Handy

    Q.   How about at this time frame here in
the middle to end of 1991 when Christopher was
removed from the Wellers and placed with the
maternal aunt?  During any of that time up
until, say, December of 1991, did you formulate
an opinion as to what you felt would be in this
child's best interests?

    A.   I'm an old-fashioned social worker.
I felt that if the family situation is stable
that children should be with their family,
whether it's extended family or what have you.
I found the Duffy's to be a very good family, a
two-parent home, two working parents.  She took
very good care of her own children.  There were
never any type of sexual abuse reports or any
type of physical reports or neglect.  So I
felt, as well as the child advocate and Judge
Sylvester, that it was a good home environment
for Christopher at that time.

        Christopher is a child that had been
with the Wellers.  I think he went to the
Wellers as a very young child.  He probably
missed them a lot.  But he adjusted to his aunt
because there were younger children his same

30

1                          Mary Handy

2         A.    Yes.

3         Q.    -- where the Wellers had hired

4    Ms. Greenfield to get them standing and Valerie

5    Jones was designated as the child advocate

6    representing Christopher, during that time

7    period, those six, eight months, whatever it

8    was, did you have any conversations with

9    Valerie Jones?

10        A.    Yes, I did.  Valerie Jones and City

11   Solicitor -- I think her name was Claudia

12   Hewitt was the city solicitor.

13        Q.    Yes.

14        A.    Yes, we would meet on the case at

15   Ms. Hewitt's office to go over the record.  And

16   I think I remember Ms. Jones -- I don't recall

17   too much.  But I think the child advocate

18   wasn't in agreement with the child leaving

19   Philadelphia and going to stay with the

20   Wellers.

21        Q.    The child advocate was not in

22   agreement?

23        A.    They were not in agreement.

24        Q.    Do you know why?

25        A.    I don't recall that.  I'm not sure.

                        Mary Handy

1  I think it was -- should I speculate?

2                  MR. FALLON:  I would just object

3       to form.

4                  MR. SIMONS:  The same objection.

5       But if you know, if she told you, you can

6       answer.

7                  THE WITNESS:  She told me she

8       didn't like the way the case was being

9       handled by the provider agency.  She

10      thought Kathy Melot was too personally

11      involved with the case.  Some of the

12      reports and stuff, she didn't agree with a

13      lot of stuff that was in there that may

14      not have been true.  So it was that kind

15      of thing.

16              It was nothing personal between the

17      two of them.  It's just that she felt she

18      was representing the Moon children.  And

19      she knew the family just as much as I did

20      because I think she worked with them

21      before I even inherited the case.

22              I think the child advocate office

23      also -- they knew this family and I guess

24      they wanted to keep the family here in

```
1                    Mary Handy
2      recommendation, we couldn't move with it.
3      So that's what happened with that case.
4  BY MR. STAGLIANO:
5      Q.    Do you recall that DHS at any point
6  in time in that six years or so had an adoption
7  goal or plan on file for this child?
8      A.    I'm not sure.  But I think adoption
9  wasn't mentioned, whether it be by the Wellers.
10 I think at one point there was talk about
11 terminating parental rights for Christopher.
12 I'm not sure.
13     Q.    Was it brought to your attention that
14 either of the Moon parents had criminal
15 histories?
16     A.    I don't know about the mother.  But I
17 remember when it was still open that the father
18 was sent to federal prison for I think setting
19 fire to a pizza shop.  That's what I remember
20 or I was told is that he spent some time in
21 prison for arson.
22     Q.    Was that down in Florida or up here?
23     A.    No, this was up here.  It was a pizza
24 shop somewhere in Kensington, I think.  The
25 owner had paid him to do it.  That was alleged.
```

43

Mary Handy

Q.   Was that during the time you had the family or afterwards?

A.   That was during that time because I think he was incarcerated for about I think four years, about three to four years, because I remember he wasn't in the home.  He was still incarcerated somewhere in I think it was Pittsburgh.  I'm not sure.

Q.   I understand what you were saying before about some prejudice against the poor perhaps being held by certain people.  But there's a difference between being poor and being an arsonist.

Did you consider the criminal history, the bipolar that you mentioned was Mrs. Moon's diagnosis in making determinations as to what would be in the best interests of these children?

MR. SIMONS:  Objection to form. You can answer.

THE WITNESS:  We have a lot of kids who are returned home with parents who have health issues such as schizophrenia, bipolar.  We put

44

1                      Mary Handy

2      appropriate services in place for these

3      families.

4           I understand that the father was

5      inappropriate, taking into consideration

6      his background.  He was a delinquent, in

7      group home, in DHS.  So I can see his

8      background.  He couldn't hold a job.

9           But the mother, she was contemplating

10     separating from him, getting a divorce.

11     He never physically abused her.  We talked

12     about that a lot.  But he was just a bad

13     egg.

14          He was in this motorcycle gang, the

15     Warlocks.  I would go there and these guys

16     would be there with motorcycles and these

17     steel-toed boots on and I'd be afraid to

18     go in.  But to the part where he allowed

19     me to come in, Oh, come on in, they won't

20     bother you.  I would go in there and sit

21     like, hey, if I can get out alive, I'm

22     okay.

23          But mother was very cordial.  When I

24     would say the house need cleaning, she

25     would clean if I tell her I'm coming.  I'd

59

1                     Mary Handy
2         A.    Right.
3         Q.    That eventually was cut off.   And I
4  guess that had to do with the adoption maybe.
5              Before that, when it was being
6  decided in the fall of 1991 what was going to
7  happen with this child and he was with
8  Ms. Duffy, the maternal aunt --
9         A.    Right.
10        Q.    -- did you consider at that time that
11 now was a time when a decision had to be made
12 what's going to happen to this child for the
13 rest of his life?  Was he going to return to
14 the Wellers or was he going to stay with a goal
15 towards something else?
16              MR. SIMONS:   Object to form.
17              THE WITNESS:   I don't recall.
18      I'm not sure.   But at that point my own
19      personal opinion was since he's there, let
20      him stay.   Why keep bringing him back?   If
21      he's in Tennessee, for him to stay in
22      Tennessee.
23              He wasn't having any visitation with
24      his biological parents or extended family
25      members.   So just having him travel here,

1                       Mary Handy

2           travel there, the child is in the middle

3           of all this.  And I thought it was time to

4           just let him stay where he was and let the

5           Wellers adopt him.

6    BY MR. STAGLIANO:

7           Q.    The last time you had spoken to Kathy

8    Melot, you said she told you the Wellers wanted

9    to adopt Christopher?

10          A.    She said that the Wellers expressed a

11   desire to adopt him and that he doing okay.

12                     THE REPORTER:  Excuse me.

13                     (Pause.)

14   BY MR. STAGLIANO:

15          Q.    I think you said -- I'm

16   paraphrasing -- the last time you had spoken to

17   Kathy Melot was that the Wellers had a desire

18   to adopt?

19          A.    Right.  I think they were already --

20   I think that proceeding had started and I think

21   it was in the process now.  I think Tennessee

22   had taken over the case once that occurred.

23   That's when DHS was no longer involved.

24                I think the Moons' parental rights

25   were terminated because I think I remember the

# EXHIBIT "B"

28

Valerie Jones

1

2  James, Steven, Kevin and Timmy and Chris.  And they

3  would all stagger home.

4              Unfortunately, the Wellers put them on a

5  bus, sent them all home except for Chris, and Chris

6  remained with them.

7              In January of '91, Mrs. Weller told us she

8  was moving to Tennessee.  There was something about

9  her daughter.  And Mr. Weller was working at Wylie

10  House at the time.  And they were reporting that they

11  were separated having marital problems.  So there was

12  no stable home or place for Chris.

13              We were challenged with what would we do.

14  So we had to, all of us, sit down and talk about what

15  was the best plan for Chris.

16              Obviously, the law requires that a child

17  not be separated from parents unless there's an

18  absolute necessity and can't provide.

19              So we had to look at now that this child

20  had been in care, what was the plan?  Could he go

21  home?

22              Mrs. Weller was not willing to take him

23  to Tennessee with her.  Mr. Weller wasn't interested.

24  And Mrs. Weller told the folks that they were not

25  going to be able to care for Chris when they moved.

1                           Valerie Jones

2     anything other than a return to the Wellers that was

3     in this child's best interest?

4          A.    Miss Steiker said at the time that she

5     couldn't say that a return to the Wellers was in the

6     child's best interest.

7          Q.    She couldn't say that it was, but did she

8     say that it wasn't?

9          A.    I don't remember.  She did not recommend

10    that he return to the Wellers in her testimony.

11         Q.    Forgetting about the Court record for a

12    second but you just personally as a professional, an

13    attorney who was retained to represent the interest

14    of this child.

15         A.    I was appointed, sir.

16         Q.    Appointed to represent the interest of

17    this child.

18              Did you support the Wellers' participation

19    in these court proceedings after June of 1991?

20         A.    In what way?

21         Q.    In your mind, did you believe it was in

22    the best interest of this child that his foster

23    parents for the last six years had a say in what was

24    going on in the court proceeding?

25         A.    Had a say or were called as witnesses?

Valerie Jones

Q.   Participated, more than just as witnesses.

MR. DOYLE:  Do you mean the legal issue of standing?

MR. STAGLIANO:  No.  I'm talking about her personally, her professional opinion.  Did she believe it was in the best interests of this child for the Wellers to be able to participate in this proceeding.

THE WITNESS:  I believe it's in the best interest of the child to get all the information for the Court; standing is a different issue.

MR. STAGLIANO:  Okay.

BY MR. STAGLIANO:

Q.   Tell me about standing.

Did you believe it was in the best interest of this child that the Wellers have standing --

MR. DOYLE:  Objection.

BY MR. STAGLIANO:

Q.   -- in these proceedings?

MR. DOYLE:  Objection.  I don't know how she could be the one who decides whether or not they have standing or not.

MR. STAGLIANO:  None of us make

Valerie Jones

1

2   decisions other than judges, but we all have our wish

3   list and our positions.

4                    MR. DOYLE:  A wish list or what the

5   law says the foster parents can do is different.

6                    MR. STAGLIANO:  Well, we also know

7   that in most instances unless somebody objects, the

8   Court is just going to go along with what the

9   attorneys agree to.

10                   THE WITNESS:  Oh, sir, that is so

11  wrong.  That is so wrong.

12  BY MR. STAGLIANO:

13       Q.  Well, my question to you remains the same.

14            What did you believe professionally and

15  personally regarding the standing of the Wellers was

16  in the best interest of this child?

17       A.   Foster parents do not have standing in

18  dependency matters.  It's been litigated.  It's been

19  the Juvenile Act.  It's a different issue of

20  participating in the hearing.

21       Q.   Would you have liked to have seen them

22  participate in the hearing?

23       A.    They did participate in the hearing.  They

24  were called as witnesses.  They had a chance to

25  present witnesses.

Valerie Jones

Q.    Did you object to their participating in the hearing?

A.    No.

Q.    Never?

A.    Did I object to standing, sir?

Q.    No.  We just used a different term.  We said participating in the hearing.

MR. DOYLE:  Well, you are kind of going in and out, participating and standing.

MR. STAGLIANO:  Sure.

MR. DOYLE:  So it your question, did she object to standing, or did she object to participation?

MR. STAGLIANO:  Did she object to them participating in the hearing?

THE WITNESS:  When?

MR. STAGLIANO:  At any time.

THE WITNESS:  I didn't object to having their testimony presented to the Court.

MR. STAGLIANO:  That's not my question.  That would make them witnesses.

BY MR. STAGLIANO:

Q.    My question is:  As to them participating in the hearing, did you object to that?

68

1                           Valerie Jones

2          A.     That's all they could be.

3          Q.     I think Judge Sylvester disagreed with

4    you.  She gave them standing as, quote, friends of

5    the Court, did she not?

6          A.     No.  She did not give them standing.  She

7    makes it clear.  'I am not giving you standing.  I

8    will allow you to participate as friends of the

9    court.'

10              And then we went through a lengthy

11   discussion of what a friend of the Court could do.

12   And I believe we all agreed that that was appropriate

13   as to how the judge concluded what level of

14   participation.

15         Q.     So you were saying that you did not object

16   to that level of participation on the part of the

17   Wellers; is that correct?

18         A.     Not the way the judge frames it.

19         Q.     Okay.  I understand your answer.

20              Did you object to them being granted

21   standing?

22         A.     Yes.

23         Q.     Why?

24         A.     Because the law does not allow foster

25   parents to have standing to participate in dependency

```
                         Valerie Jones
 1
 2    proceedings prior to the termination of parental
 3    rights.
 4         Q.    With all due respect, who cares what the
 5    law allows?  You're representing the child.
 6              What did you want?  Why did you object to
 7    the Wellers being granted standing?
 8                   MR. DOYLE:  Let me understand your
 9    question.  Who cares what the General Assembly says
10    about the general act?
11                   MR. STAGLIANO:  Absolutely.
12                   MR. DOYLE:  Who cares what the
13    Supreme Court says about the standing of foster
14    parents?
15                   MR. STAGLIANO:  Correct.
16                   MR. DOYLE:  Who cares what the
17    precedents are on that issue?
18                   You don't care, and that's not an
19    issue in this case.  Are you trying to tell me that?
20                   MR. STAGLIANO:  No.  I'm asking her
21    why she went out of her way to take a position to
22    resist a request for standing by these foster parents
23    who have raised this child from essentially infancy?
24    Why she did not want that personally and
25    professionally, why she did not want that to happen.
```

1                        Valerie Jones

2                MR. DOYLE:   She answered the

3    question.

4                MR. STAGLIANO:   I don't think she

5    did, but I'll let the record stand the way it is.

6    BY MR. STAGLIANO:

7        Q.   You never spoke to the Wellers, did you,

8    during this time frame, June of 1991 through February

9    of 1992, outside of questions in the courtroom.

10       A.   I know they were in the office.   I don't

11   remember if I spoke to them.   I remember hearing

12   where they were in the courtroom, but I don't

13   remember if I spoke to them, as you want to put it.

14       Q.   Do you recall in February of 1992

15   objecting to even the Court's ranting of the, quote,

16   friend of the court status and asking the question be

17   certified to Superior Court.

18                MR. DOYLE:   Wait a second.

19                MR. STAGLIANO:   Sure.

20                MR. DOYLE:   February 25?

21                MR. STAGLIANO:   Correct, February

22   25, 1992.

23                MR. DOYLE:   Let's just get that out

24   before we --

25                MR. STAGLIANO:   I'm sorry, but I

1                       Valerie Jones

2    can't give you a page.  I assume it must have

3    occurred in the very beginning.

4                    MR. DOYLE:  Hang on a second.

5                    MR. STAGLIANO:  Okay.

6                    MR. DOYLE:  Do you have a page

7    number at all?

8                    MR. STAGLIANO:  No.

9                    MR. DOYLE:  Off the record for a

10   second.

11                   (Discussion held off the record.)

12                   MR. DOYLE:  You're talking about a

13   hearing February 25th of 1992, and you're asking

14   whether Miss Jones joined in a request to certify the

15   issue of standing on the appellate process?

16   BY MR. STAGLIANO:

17       Q.   Do you agree that you did that at that

18   time?

19       A.   Yes.

20       Q.   Why?

21       A.   Because foster parents do not have

22   standing.

23       Q.   The Court just disagreed with you on the

24   record as the attorney representing this child.

25                   And looking to secure what was in his best

                        Valerie Jones

1   interest, why did you object?  Why did you join in

2   the objection or the request for the certification of

3   the question?

4        A.    Because the law does not allow standing.

5             It's been long standing that foster

6   parents do not have standing, and the reasons are

7   very significant why they have not been granted

8   standing prior to the goal change termination.

9        Q.    So did you believe then that this question

10  had importance to you as an attorney for more global

11  reasons than Christopher Moon and that you were more

12  interested is preserving the law as it was to that

13  point?

14       A.    No.  I was more interested in

15  Christopher's well-being.

16       Q.    And you thought that denying the Wellers'

17  standing was in his best interest?

18       A.    That's correct.

19       Q.    Why?

20       A.    Because foster parents have a

21  long-standing history when they decide of an issue or

22  something they're specifically interested in to try

23  and to influence the child.

24            And that's why the case law is very clear

1                    Valerie Jones

2    answers.

3                    MR. STAGLIANO:  Yeah, because it's

4    really more a date question than anything else.

5    BY MR. STAGLIANO:

6        Q.    Before February 25, 1992, had you seen

7    this report and received the testimony and the

8    opinion of Dr. Bazelon, B-a-z-e-l-o-n, that she felt

9    it was very much in the best interest of this child

10   that he be returned to the Wellers?

11                   MR. DOYLE:  Didn't she testify this

12   day?

13                   THE WITNESS:  She testified.  No it

14   was December, whatever day.

15                   MR. STAGLIANO:  She testified in

16   December.

17                   THE WITNESS:  I think the.

18   December --

19                   MR. DOYLE:  December?

20                   THE WITNESS:  Well, there's --

21                   MR. DOYLE:  Hold on.  But go ahead.

22                   What was the question?

23   BY MR. STAGLIANO:

24       Q.    In other words, on February 25, 1992, did

25   you not know of Dr. Bazelon's opinion, that it was in

1                         Valerie Jones

2    Christopher's best interest that he be returned to

3    the Wellers?

4         A.    Dr. Bazelon had not been providing any

5    service to Christopher.  She was a friend of Marjorie

6    Greenfield who was representing the Wellers.

7              She was asked to see Christopher at her

8    home, and I believe the testimony was Marjorie

9    brought him over.  They had ice cream.  And based on

10   that, she decided to make a speech about -- to the

11   Court.

12             MR. DOYLE:  Just going back, I

13   don't believe she did testify in December; at least I

14   don't think so.

15             THE WITNESS:  I don't remember the

16   date.

17             MR. DOYLE:  Okay.

18             MR. STAGLIANO:  I think she

19   actually testifies this date.

20             MR. DOYLE:  February --

21             MR. STAGLIANO:  February 25, 1992.

22             MR. DOYLE:  Yeah.  That's for sure.

23             MR. STAGLIANO:  Right.

24   BY MR. STAGLIANO:

25        Q.    But you had seen this report prior to her

82

                    Valerie Jones

1
2    testimony, correct?

3        A.    I can't remember whether she submits it to

4    Miss Greenfield, who gives a test at the hearing.  I

5    don't remember the time lapse.

6        We may have gotten it at the hearing and

7    were told to review it.

8        Q.    Do you agree with me -- because my

9    question started a different way and you took it in a

10   different direction.

11       My question is simply:  Do you agree with

12   me that Dr. Bazelon stated opinion in that report

13   that it was in the best interest of the child to be

14   returned to the Wellers?

15       A.    Her summary says that very position.

16       Q.    It states it pretty clearly, correct, and

17   pretty emphatically that -- not equivocally at all?

18       A.    She states what she states.

19       Q.    Now, you then have just testified about

20   such things as she was a friend of Dr. Bazelon, was a

21   friend of Ms. Greenfield, Dr. Bazelon saw the child

22   maybe at Ms. Greenfield's home?

23       A.    Yes.

24       Q.    Did you consider the things that you've

25   just annunciated for us reasons why you chose to

Valerie Jones

1

2   discount or ignore Dr. Bazelon's opinion?

3       A.    Oh, no.   I considered Dr. Bazelon's

4   opinion.

5       Q.    You considered it.   And what, if anything,

6   did you do about it?

7       A.    I talked with her.   I can't tell you the

8   time sequence.

9       Q.    Do you recall persistently objecting to

10  her testimony?

11      A.    As Miss Greenfield's friend, yes.

12      Q.    Do you recall objecting to her testifying

13  about the behavior of any of the other Moon children?

14  And this occurs on Pages 63 through 65 of that

15  February 25, 1992 transcript.

16      A.    I'm sure she testified to what she

17  testified.   I don't remember what she said.

18      Q.    I don't care what she said.   I'm talking

19  about what you said.

20          Do you remember persistently objecting to

21  her testifying about the other Moon children?

22      A.    I don't recall it.

23      Q.    Why don't you take a look at Pages 63

24  through 65?

25      A.    Okay.   I see what -- it was stated.

Valerie Jones

weren't mine to --

Q.   Did you make any objections to those
drawings or notes being shared from Dr. Sexton to Dr.
Bazelon?

A.   I don't know.

Q.   Do you recall that there's an allegation
that you gave Dr. Sexton two days' notice before a
January 29th hearing that she was going to be called
to testify?  Do you recall doing that?

A.   No.  She would have known the day that the
matter was last in court.

Q.   How would she have known?  She didn't
attend every court hearing, did she?

A.   No.  But she would have been notified if
she was going to be a witness.

Q.   By whom?

A.   By whoever is calling her.

Q.   Well, she was actually your employee,
correct?

A.   No.  That's the misunderstanding.  She did
this not as an employee of the Defender Association
but as someone independent.  She did not do it in her
role as a juvenile social worker.  She was with the
Juvenile Division.

Valerie Jones

Q.   Would you agree with me that the two reports that we've marked as evidence that she authored were actually on your letterhead?

A.   They're on Defender letterhead; that's correct.

Q.   Well, if she was required to testify on January 29th, who other than your office would have told her that she was required to testify?

A.   I have no idea.  I don't remember the incident at all.

You have to understand who is writing these letters too.

Q.   Number 4 says, "Ms. Jones never informed the Court at the December hearing that Christopher's school had referred him to The Children's Crisis Treatment Center because of the severity of his behavior problems and never revealed the existence of a psychological report or of the treatment.  Ms. Jones permitted witnesses who knew of this situation to testify that Christopher was improving and adjusting when she and they had access to the information demonstrating that it was not true."

Did you do that?

A.   No.  I don't know what Mr. Churchill is

# EXHIBIT "C"

# AFFIDAVIT OF CAROLEE WELLER

I have read pages 27 through 29 of the deposition of Valerie Jones dated May 18, 2007. Almost all of her facts are false.

First, we never put any children "on a bus" and sent them home. CONCERN removed Jimmy first with one of their drivers. Approximately two weeks later CONCERN removed two more of the boys and lastly Timmy was taken home by CONCERN. The plan back then in 1987 was to return Christopher also, however, things quickly deteriorated in the Moon household. Two of the boys, at least, were shipped to Florida to live with a relative.

Once that happened we began asking to adopt Christopher. In 1989 the Department of Human Services finally changed the goal to adoption but no one ever did anything to further that goal.

In 1991 we decided to move to Tennessee due to health problems with my parents. We met with Mary Handy of the Department of Human Services. We confirmed our continuing desire to keep Christopher and to adopt him. She helped us get the necessary paperwork so that we could have custody in Tennessee and then we took Christopher and moved there. We never met with or spoke to Valerie Jones at that time.

My husband and I were not separated at that time. We did separate once for approximately two months but that was two years before!

When we returned to Philadelphia in May of 1991 with Christopher, we understood that we were going to finally begin the adoption process. Instead Christopher was taken from us without warning or explanation.

Also, I specifically object to the notion that the Moons were just "poor" people who could not parent well because of lack of money. When we first got Christopher as an infant, I immediately took him to a pediatrician because I feared retardation. Instead I was told that he had been abused, specifically by being shaken. I know also that at least two of the other Moon boys ended up in psychiatric hospitals.

I, Carolee Weller, hereby verify and say that the facts set forth above are true and correct to the best of my knowledge, information and belief made subject to the penalties of 18 Pa. C.S. Section 4904, relating to unsworn falsification to authorities.


_Carolee Weller_
CAROLEE WELLER

Sworn to and subscribed before me this 21st day of February
2008.

_Carrie Fitzpatrick_
Notary at Large

My commission expires 4/21/08

**EXHIBIT "D"**

MICHAEL CHURCHILL
CHIEF COUNSEL

JEROME BALTER
KAREN L. BLACK
THOMAS K. GILHOOL
JUDITH A. GRAN
FRANK J. LASKI
LISA MILLETT RAU

JOHN P. STEVENS III
DIRECTOR OF DEVELOPMENT

**pilcop**

PUBLIC INTEREST LAW CENTER

125 S. 9th ST., SUITE 700, PHILA., PA 19107

EDMUND B. SPAETH, JR.
CHAIRMAN OF THE BOARD

EDWIN D. WOLF
EXECUTIVE DIRECTOR
1974-1976

January 22, 1992

Ms. Ellen Greenlee
Defender Association of Phila.
121  North Broad Street
Tenth Floor
Philadelphia, PA  19107

    **RE:  Christopher Moon**

Dear Ellen:

    I am enclosing a report prepared by Dr. Bazelon in this matter.

    Meg Greenfield and I would like very much to meet with you and discuss the position of the Child Advocate Unit.  It is my understanding that your counsel opposed the transfer of Christopher Moon to his natural parents prior to the Court ordering it in June. Somehow, however, despite the traumatic events of late June, her position has changed and Val Jones is now pressing for continuing to keep Christopher Moon from the only parents he knew for the first six years of his life and for eventual unification with his natural family.

    I am very disturbed by the discrepancies between Ms. Jones' statement in Court that Dr. Sexton had no desire to testify and had placed all of her material in her report and the statements made by Dr. Sexton to Dr. Bazelon.  I am also disturbed that at the last hearing Ms. Jones and the City did not divulge to the Court that because of "agitation" at school Christopher Moon had been referred to a psychiatrist who prescribed Ritalin and labelled him as having deficit disorder.

RECEIVED

PUBLIC INTEREST LAW CENTER OF PHILADELPHIA

Ms. Ellen Greenlee
January 22, 1992
Page Two


    Judge Sylvester has scheduled a hearing on January 29th.  I
hope we can have a meeting promptly.

                              Sincerely,

                              Michael Churchill

MC:sba

Enclosure
cc:  William Norvell
     Val Jones
     Meg Greenfield

MICHAEL CHURCHILL
CHIEF COUNSEL

JEROME BALTER
KAREN L. BLACK
THOMAS K. GILHOOL
JUDITH A. GRAN
FRANK J. LASKI
LISA MILLETT RAU

JOHN P. STEVENS III
DIRECTOR OF DEVELOPMENT

PUBLIC INTEREST LAW CENTER OF PHILADELPHIA



# pilcop

125 S. 9th ST., SUITE 700, PHILA., PA 19107

215-627-7100

EDMUND B. SPAETH, JR.
CHAIRMAN OF THE BOARD

EDWIN D. WOLF
EXECUTIVE DIRECTOR
1974-1976

**HAND DELIVER**

February 13, 1992

Ellen Greenlee
The Defender Association of Pennsylvania
121 North Broad Street
Philadelphia, PA 19107

Dear Ellen:

I am writing again because I have had no reply about some of the important issues I raised in my last letter. I want to make clear that I regard the actions of one of your attorneys as one of the most serious breaches of professional responsibility that I have seen and I believe it raises serious issues not only about the ethics of the attorney but about training and supervision.

First, Bill Norvell did call to tell me that because of a conflict within the office about what position to take, the Defender was withdrawing as the child's counsel. Subsequently my co-counsel was told the Defender's office did not want to have to cross-examine its own expert, Dr. Sexton. When Dr. Sexton (who was not told about the January 29th hearing until January 27th) was not called to testify, Ms. Jones decided she could continue to participate and attempt to prevent Christopher from being reunited with his long-term (from 2 months old to 6 years old) foster parents. Ms. Jones continued to take that position even after hearing the testimony of Dr. Bazelon as to the damage and injury to the child.

I must say I don't understand what lawyers are doing in deciding the factual issue of a child's needs when they reject their own experts statements and those of the only other experts consulted. Are Ms. Jones and Mr. Norvell that much more knowledgeable than Drs. Sexton and Bazelon? Are they relying on anyone other than themselves?

This is not a small matter because either Ms. Jones and Mr. Norvell have concluded factually that their client has not been injured by the events of this year, or they regard the injury as legally not determinative of what should happen to him. Since I think we would both agree that if the child is being injured by what is happening it is the Defender's duty to persuade the Court not to allow it -- and since Ms. Jones and Mr. Norvell have not

RECEIVED FEB 14 1992

PUBLIC INTEREST LAW CENTER OF PHILADELF

Ellen Greenlee
February 13, 1992
Page 2

done that -- I have to conclude they believe he was not being injured.  Again, I must ask, on what evidence?

But that is secondary to the breaches of responsibility to the child and to the Court which occurred:

1.    Ms. Jones has continually misrepresented Dr. Sexton's position.  Dr. Sexton asked to testify on July 8th and Ms. Jones told her she could not.  She continued to state her desire to testify and Ms. Jones told the Court repeatedly that she did not wish to testify and had "nothing more to say".  She repeated this again during the last week of January.  It is utterly untrue, as demonstrated by the fact that she also stated that she did not want to be in the position of having to cross-examine her own expert.  Presumably Dr. Sexton wanted to say things different from what the Court had already heard and what Ms. Jones wanted the Court to know, otherwise why would it have been necessary to cross-examine her?  Ms. Jones represented it was "all in Dr. Sexton's report" but in fact Dr. Bazelon testified about other information not included in the report, for example how Christopher clung to her secretary and did not want to leave the office with his aunt.

2.    Ms. Jones did everything she could to deny Dr. Bazelon access to Dr. Sexton and to Dr. Sexton's notes.  Was this considered to be in the best interest of the child?  Or was this a ploy so that evidence would not be available to the Court appointed expert?  Surely she knew that they contradicted her own statements.

3.    Although Judge Sylvester told Ms. Jones in December that she wanted Dr. Sexton to testify and although Ms. Jones asserted Dr. Bazelon could not testify until Dr. Sexton testified as to the circumstances of the visits and drawings, Ms. Jones never notified Dr. Sexton of the January 29th hearing until two days before.  The date of the hearing had been set in December.

4.    Ms. Jones never informed the Court at the December hearing that Christopher's school had referred him to The Children's Crisis Treatment Center because of the severity of his behavior problems and never revealed the existence of a psychological report or of the treatment.  Ms. Jones permitted witnesses who knew of this situation to testify that Christopher was improving and adjusting when she and they had access to the information demonstrating that it was not true.  She made no attempt to ask any witness who should have known about this information about it.  She then sought to deny Dr. Bazelon access to these reports.  Dr. Bazelon testified that this information was important in her assessment of the child.

Ellen Greenlee
February 13, 1992
Page 3

5.   The therapist, Ms. Sandra Steiker, had notes which indicated Christopher's continual requests to go back to Tennessee and his foster parents.  She didn't report this and Ms. Jones did not ask about it -- either because she did not want to bring this out or because she had not examined the notes and was not prepared to cross-examine the therapist on behalf of her client.

No matter what view an attorney may have as to the standing of foster families, I cannot imagine how it excuses such conduct. It is not for me to speculate why this occurred and why Mr. Norvell permitted it to continue, but I believe it is my obligation to bring it to your attention and yours to find out why it happened and how to prevent its reoccurrence.  I have not determined whether this requires a referral to the disciplinary board.  Suppression of evidence of this sort is particularly grave when the client, a child, has no effective say in directly controlling his attorney or making his desires known except through evidence permitted by his attorney.  The attorney's obligation to have all information presented to the Court is compounded because the law makes information about the client confidential in order to protect the client; here the attorney actively used that confidentiality as a way not of protecting her client but to suppress admissible and highly relevant evidence about that client's wishes and needs from reaching the Court.

Finally, I would like to remind you that this is the second time that I know of in which your office has failed to understand and therefore to vigorously act to protect an infant's attachment to psychological parents.  I had hoped after the first instance some discussion and training would occur.  The first time there was no question that there was a difference in judgment, albeit without any attempt by the unit to consult any professionals.  This second time is more upsetting because not only does it involve the same problem of not recognizing a child's needs but adds the element of ignoring professional advice and deliberate deception and hostility.  And then to make it worse, once the child made allegations (in a manner which all three "experts" consulted -- Dr. Bazelon, Dr. Sexton and Ms. Steiker -- believed were true) of sexual attacks by three members of his natural family  your office continued to support unsupervised visits with those family members and an eventual return home.  It appears to me there are substantial training needs in these areas which I would be glad to discuss with you.

Because of the seriousness of these matters and the inadequate response by Mr. Norvell last time, I would suggest that you speak personally to Dr. Sexton.  I am not familiar with what procedures

Ellen Greenlee
February 13, 1992
Page 4


your office utilizes in conducting impartial investigations to examine conduct of attorneys but this matter goes far beyond any issue of whether I disagree with Ms. Jones on what is best for a particular client but to the way the child advocate unit attorneys conduct their business, and the nature of their obligation to client and court.

I am not copying Ms. Jones or Mr. Norvell but will leave it to you as to how you wish to keep them informed. I am available to meet with you to discuss this matter in person if you wish.

I am sorry to have to renew this matter and I await your reply as to how you will proceed.

Sincerely,

Michael Churchill

MC:lr

cc:  Marjorie E. Greenfield, Esquire
     Edmund B. Spaeth, Jr., Esquire

# EXHIBIT "E"

**COURT OF COMMON PLEAS, FAMILY DIVISION**
**PHILADELPHIA COUNTY**

D1274-85-8

No.

IN RE: *Christopher Moon*

**DEPENDENCY REVIEW ORDER**

AND NOW, this __13__ day of _Jan_ , 198_9_ , after full consideration of all the testimony and evidence presented by the parties, this Court makes the following decision:

1. The above-mentioned child should:

_____ Be returned to parents/legal guardian

_____ Continue in foster care for _____ months since the Court finds that such placement continues to be appropriate and necessary

_____ Be placed for adoption

_____ Continue in foster care on a permanent/long-term basis because of the child's special needs/circumstances and the Court finds that such placement continues to be appropriate and necessary

_____ Other *(Specify)* __DHS Commit p___d__

_____2436 Ella St_____

2. There has/has not been compliance with the plan. *(Specify)* _____
   _by agreement_ _____ _goal changed to adoption_ ___

3. There has/has not been progress made toward alleviating the circumstances which necessitated the original placement. *(Specify)* _____

4. The Court projects that the goal for the child may be achieved by _____ .
   (DATE)

5. The Court finds that the Petitioner is taking reasonable efforts to reunify the child with his/her family, if applicable, and if the goal is not to return home, the absence of efforts to make it possible for the child to return home is reasonable.

6. Other _____

AND NOW, based on petitioner's, the Department of Human Services, request for a dispositional review hearing this Court schedules that hearing for __4-17-89__ , 9:00 a.m., 1801 Vine Street, Court Room _48_ . At that hearing, this Court shall decide, if appropriate, the following issues:

   1. Whether the child should be: (1) returned to the parents; (2) continued in foster care for a specified period; (3) placed for adoption; or (4) because of the child's special needs or circumstances continued in foster care on a permanent long-term basis;

   2. Determine the continuing necessity for and appropriateness of the placement;

   3. Determine the extent of compliance with the service plan;

   4. Determine the extent of progress made toward alleviating the circumstances which necessitated the original placement;

   5. Project a likely date by which the goal for the child might be achieved; and

   6. Determine that reasonable efforts are under way to make it possible for the child to return home, if appropriate, and if the goal is not to return home, the absence of efforts to make it possible for the child to return home is reasonable.

_____                                    _____
COURT CLERK                                        JUDGE

**EXHIBIT "F"**

COURT OF COMMON PLEAS, FAMILY DIVISION
PHILADELPHIA COUNTY

D13714-75-8

IN RE: Christopher Moon

No

**DEPENDENCY REVIEW ORDER**

AND NOW, this ___2___ day of ___April___, 19 _90_, after full consideration of all the testimony and evidence presented by the parties, this Court makes the following decision:

1. The above-mentioned child should:

   _____ Be returned to parents/legal guardian

   _____ Continue in foster care for _____ months since the Court finds that such placement continues to be appropriate and necessary

   _____ Be placed for adoption

   _____ Continue in foster care on a permanent/long-term basis because of the child's special needs/circumstances and the Court finds that such placement continues to be appropriate and necessary

   ___✓___ Other (Specify) _____DHS Commend. Granto_____

   _____

2. There has/has not been compliance with the plan. (Specify) _____

   _____

3. There has/has not been progress made toward alleviating the circumstances which necessitated the original placement. (Specify) _____

4. The Court projects that the goal for the child may be achieved by _____
   *(DATE)*

5. The Court finds that the Petitioner is taking reasonable efforts to reunify the child with his/her family, if applicable, and if the goal is not to return home, the absence of efforts to make it possible for the child to return home is reasonable.

6. Other _PHS to decide) wh to proceed with adoption goal_

   _____

AND NOW, based on petitioner's, the Department of Human Services, request for a dispositional review hearing, this Court schedules that hearing for ___5/16/90___, 9:00 a.m., 1801 Vine Street, Court Room _____. At that hearing, this Court shall decide, if appropriate, the following issues: _Hollis_

   1. Whether the child should be: (1) returned to the parents; (2) continued in foster care for a specified period; (3) placed for adoption; or (4) because of the child's special needs or circumstances continued in foster care on a permanent long-term basis;

   2. Determine the continuing necessity for and appropriateness of the placement;

   3. Determine the extent of compliance with the service plan;

   4. Determine the extent of progress made toward alleviating the circumstances which necessitated the original placement;

   5. Project a likely date by which the goal for the child might be achieved; and

   6. Determine that reasonable efforts are under way to make it possible for the child to return home, if appropriate, and if the goal is not to return home, the absence of efforts to make it possible for the child to return home is reasonable.

_____          _____
COURT CLERK                              JUDGE

**EXHIBIT "G"**

**COURT OF COMMON PLEAS, FAMILY DIVISION**
**PHILADELPHIA COUNTY**

IN RE: *Christopher Moon*

No.

**DEPENDENCY REVIEW ORDER**

*D 1274-85-8*

AND NOW, this _____9_____ day of _____Jan_____, 19 *91*, after full consideration of all the testimony and evidence presented by the parties, this Court makes the following decision: *C, H, DHS Rep,*

1. The above-mentioned child should: *C LS/ mother*

   _____ Be returned to parents/legal guardian

   _____ Continue in foster care for _____ months since the Court finds that such placement continues to be appropriate and necessary

   _____ Be placed for adoption

   _____ Continue in foster care on a permanent/long-term basis because of the child's special needs/circumstances and the Court finds that such placement continues to be appropriate and necessary

   _____ Other (Specify) *DHS Commit — Stand*

   _____

   _____

2. There has/has not been compliance with the plan. *(Specify)* _____

   _____

3. There has/has not been progress made toward alleviating the circumstances which necessitated the original placement. *(Specify)* *No stane at this time.*

   _____

4. The Court projects that the goal for the child may be achieved by _____
   *(DATE)*

5. The Court finds that the Petitioner is taking reasonable efforts to reunify the child with his/her family, if applicable, and if the goal is not to return home, the absence of efforts to make it possible for the child to return home is reasonable.

6. Other *A FSP meeting before the next Court date Child's Fos. Parents are interested in adoption Recommended whether appropriate goal*

AND NOW, based on petitioner's, the Department of Human Services, request for a dispositional review hearing, this Court schedules that hearing for *3-15-91*, 9:00 a.m., 1801 Vine Street, Court Room _____E_____. At that hearing, this Court shall decide, if appropriate, the following issues:

1. Whether the child should be: (1) returned to the parents; (2) continued in foster care for a specified period; (3) placed for adoption; or (4) because of the child's special needs or circumstances continued in foster care on a permanent long-term basis;

2. Determine the continuing necessity for and appropriateness of the placement;

3. Determine the extent of compliance with the service plan;

4. Determine the extent of progress made toward alleviating the circumstances which necessitated the original placement;

5. Project a likely date by which the goal for the child might be achieved; and

6. Determine that reasonable efforts are under way to make it possible for the child to return home, if appropriate, and if the goal is not to return home, the absence of efforts to make it possible for the child to return home is reasonable.

_____
COURT CLERK

_____
JUDGE

# EXHIBIT "H"

COURT OF COMMON PLEAS, FAMILY DIVISION
PHILADELPHIA COUNTY

No.

IN RE:

*Christopher Moon*

DEPENDENCY REVIEW ORDER   *1274-83-8*

AND NOW, this _____ 20 _____ day of _____ MAy _____, 198 *9*, after full consideration of all the *DHSSa/Scott SW*
testimony and evidence presented by the parties, this Court makes the following decision: *Foster Parents Counsel, Parental Counsel,*
1.  The above-mentioned child should: *Ca. City Sol, M. Aunt!*

_____ Be returned to parents/legal guardian

_____ Continue in foster care for _____ months since the Court finds
that such placement continues to be appropriate and necessary

_____ Be placed for adoption

_____ Continue in foster care on a permanent/long-term basis because of the child's
special needs/circumstances and the Court finds that such placement continues
to be appropriate and necessary

_____ Other (Specify) *DHS Commit — Stand*

_____

2.  There has/has not been compliance with the plan. *(Specify)* _____

_____

3.  There has/has not been progress made toward alleviating the circumstances which necessitated the
original placement. *(Specify)* *Counsel request an Independant Therapist Forthwith for child.*

4.  The Court projects that the goal for the child may be achieved by _____
(DATE)

5.  The Court finds that the Petitioner is taking reasonable efforts to reunify the child with his/her family, if
applicable, and if the goal is not to return home, the absence of efforts to make it possible for the child to
return home is reasonable.

6.  Other *Day Visits to begin on a trial basis the first Wk. One night visit the next week. Level III Scott to be implemented by*

AND NOW, based on petitioner's, the Department of Human Services, request for a dispositional review
hearing, this Court schedules that hearing for *6-13-91*, 9:00 a.m., 1801 Vine Street, Court Room
*E*. At that hearing, this Court shall decide, if appropriate, the following issues:
1.  Whether the child should be: (1) returned to the parents; (2) continued in foster care for a specified
period; (3) placed for adoption; or (4) because of the child's special needs or circumstances continued in foster
care on a permanent long-term basis;
2.  Determine the continuing necessity for and appropriateness of the placement;
3.  Determine the extent of compliance with the service plan;
4.  Determine the extent of progress made toward alleviating the circumstances which necessitated the
original placement;
5.  Project a likely date by which the goal for the child might be achieved; and
6.  Determine that reasonable efforts are under way to make it possible for the child to return home, if
appropriate, and if the goal is not to return home, the absence of efforts to make it possible for the child to return home
is reasonable.

*Theresa M. Sentwood*                    *EK Sylvester*
COURT/CLERK                                    JUDGE

85-545                    WHITE COPY — COURT RECORD        CANARY COPY — DHS CASE RECORD

# EXHIBIT "I"

-9-

Addendum:
     Eileen Sexton was never allowed to present all of her
findings to the court.  She presented a five minute summary of
her report on June 26, 1991.  She was never called again despite
the fact that she asked repeatedly to testify.  She was not able
to tell the judge that Christopher had said that Crystal Dufy had
molested him.  She sent copies of her report to The Honorable
Esther Sylvester, DHS, and Val Jones.  She told Val Jones and
Michael Lewis of her findings.  No one ever contacted her in
response to the report.

_Eileen Bazelon_ M.D.
Eileen Bazelon, M.D.

EB/dfw
1/13/92

**EXHIBIT "J"**

PETITION – DEPENDENT — *PETITION NO.*    D#1274-85-8
PETICION – DEPENDIENTE

JUVENILE BRANCH – FAMILY COURT DIVISION
PHILADELPHIA COURT OF COMMON PLEAS

| | |
|---|---|
| **FILING DATE** – *Fecha de Registration* 8/12/85 | **PETITION DATE** – *Fecha de Peticion* 8/12/85 | **JUVENILE NO.** 259879 |
| **BIRTH DATE** – *Fecha de Nacimiento* 5/15/85 | **SEX** – *Sexo* M | **RACE** – *Raza* N | **PETITIONER CODE** | **AREA CODE** |
| **RELIGION** C | **SCHOOL OR OCCUPATION** *Escuela u Ocupacion* | **ATTORNEY CODE** |
| **MAR. STATUS NAT. PARENTS** | **CHILD LIVES WITH** *Nino Vive Con* | **SCHOOL OCC. CODE** |

NAME, ALIAS, ADDRESS (No. & Street, City, State & Zip) OF ALLEGED DEPENDENT
*NOMBRE, ALIAS, DIRECCION (Numero y Calle, Ciudad y estado, zona postal) DE ALEGADO DEPENDIENTE*

MOON, Christopher
900 City Hall Annex
Phila., PA 19107

**PARENTS OR GUARDIAN (S)** (Name & Address)
*PADRES O GUARDIANES LEGALES (Nombre y direccion)*

James Moon, Father, 4218 Paul
St., Phila., PA
Pearl Moon, Mother
2029 E. Auburn St.
337 Tusculum (34)

**PHONE** (Telefono) NO.
533-7946

**NATURE OF ALLEGED DEPENDENCY** – *NATURALEZA DE DEPENDIENTE ALEGADA*

1 – Inability of parent/custodian to provide adequate care.
*Padres o guardian no pueden dar cuido adecuado.*
X – Neglect by parent/custodian to provide adequate care or control.
*Negligencia des padres o guardian dar cuido adecuado o control.*
3 – Mental/physical health problem.
*Problema mentales o de salud fisica.*
4 – No parent or custodian. *Ningun padre o guardian.*
X – Abuse or cruel treatment. *Abuso atratamiento cruel.*
7 – Abandonment – *Abandnum*
8 – Delinquent Court Refer. – *Delincuente referido por la corte*
9 – Truancy – *Ausencia sin excusas*

I – Incorrigibility
*Incorregible*
R – Runaway
*Se Fugo*
0 – Other – *Otro*

**PETITIONER** (Name & Address) *PETICIONARIO* (Nombre y Direccion)

Charlene Ingram
900 City Hall Annex
Phila., PA 19107

**WITNESSES** (Name & Address) *TESTIGOS* (Nombre y Direccion)

Walter Klus, 900 City Hall Annex, Phila., PA 19107, 686-7828
Pearl Moon, 4218 Paul St., Phila., PA 533-7946
James Moon, 4218 Paul St., Phila., PA 533-7946
James Kantor, M.D., 1331 E. Wyoming Ave., Phila.,PA 19124, 288-2727
Mark Rosenberg, M.D., 1331 E. Wyoming Ave., Phila., PA 19124, 581-9570 or 537-7586

---

IF CHILD IS IN CUSTODY, COMPLETE THE FOLLOWING – SI NINO ESTA BAJO CUSTODIA, LLENE LO SIGUIENTE

| **SHELTER CARE FACILITY** – *Institucion donde esta el nino* | **CODE** – *Cifra* | **DATE & TIME TAKEN INTO CUSTODY** – *Fecha y hora cuando fue puesto en custodia* | **TAKEN INTO CUSTODY BY** – *Fue puesto en custodia por* |
|---|---|---|---|
| Concern, Fleetwood, PA | | 8/15/85 | DHS |

Your petitioner respectfully alleges that the above named juvenile is a dependent child under provisions of the Pennsylvania Juvenile Act of 1972 as amended and that it is in the best interest of the child and the public that these proceedings be brought. The facts which bring the child within the jurisdiction of the Court are as follows:

*Su peticionario respectuosamente alega que el menor nombrado arriba es un nino privado bajo provisiones del Acta Juvenile de Pennsilvania de 1972 y que es en el mejor interes del nino y del publico que estos procedimientos sean llevados a cabo. Los hechos que traen al nino dentro de la Jurisdiccion de la Corte son los siguientes:*

We are filing a petition to request that Christopher Moon be adjudicated dependent under the Juvenile Act and neglected and/or abused under the Child Protective Service Act and committed to DHS. The Moon family became known to DHS on 7/17/85 when Parkview Hospital filed a CY-47 on Christopher alleging that the child was malnourished, he had pneumonia, she failed to provide the child with the necessary medication and shook the child violently in the ER. Worker visited the hospital, saw the child and consulted with the attending pediatrician, James Kantor, M.D. wh stated that he felt that the child who was also born with an umbilical hernia in addition to the aforementioned problems would be at definite risk if returned home. A restraining order was obtained on 7/31/85 and a detention hearing was heard on 8/1/85 when Judge Cipriani temporarily committed Christopher to DHS. He was placed in Concern, Fleetwood, PA on 8/2/85 until the adjudicatory hearing slated for 8/6/85. It is recommended by DHS that Christopher remain in placement until all medical problems have been cleared up and the child returns to stability. "Further, if said child is found to be a dependent child and is to enter placement or commitment or is otherwise removed from his home at disposition, DHS prays that this court determine whether reasonable efforts were made by the Philadelphia County Children and Youth Agency to prevent such placement or if such preventive services were not offered due to the emergency nature of the placement, whether such lack of services was reasonable."

COMMONWEALTH OF PENNSYLVANIA    ss.
COUNTY OF PHILADELPHIA

Subscribed and sworn to before me

this **20th** day of **August** 19 **85**

*John Mayr*
Notary Public

I, the petitioner, being duly sworn, say that the facts set forth in the above petition are true to the best of my information and belief.

*Yo, el peticionario, declarando bajo juramento, digo que los hechos radicados en la peticion arriba son la verdad a mi leal saber y entender.*

*Charlene Ingram / EJ*
Petitioner – *Peticionario*

---

IMPORTANT – HEARING INFORMATION — IMPORTANTE – INFORMACION ACERCA DE VISITA

| | | | | |
|---|---|---|---|---|
| X **Case is listed for hearing** | | | | ☐ No hearing needed – *No se necesitara vista* |
| **AT (Time)** – *Hora* 9:00 AM | **ON (Date)** *Fecha* 8/20/85 | **COURT ROOM** – *Sala de corte* "F" | **AT En** 1801 Vine Street *1801 Calle Vine* | ☐ You will be notified by mail of court date. *Usted sera notificado por correo de su para corte.* |

30-307 (Rev. 2 78)

RECORD ALL COURT ACTIONS ON REVERSE SIDE

# EXHIBIT "K"

127/26

## CARLIN KNIGHT, ESQUIRE
**Attorney at Law**
**414 West State Street**
**Media, Pennsylvania 19063**
**Phone: (610)565-8210 Fax: (610) 565-7730**
**E-mail: cknightesquire@aol.com**

### BAR ADMISSION

Supreme Court of Pennsylvania                                   **November 1994**

### EDUCATION

**Widener University School of Law**                        **J.D. awarded May 1994**
Wilmington, Delaware                                                  **Cum Laude**

Honors:
1993-1994 Zelda K. Herrmann Memorial Cup Commencement Award for
excellence in scholarship and leadership.
Phi Delta Phi, Harrington Inn, Honor Chapter

**The Family Institute of Philadelphia**               **Diploma awarded May 1985**
Philadelphia, Pennsylvania
Post-Masters Clinical Program (1982-1985)
Family Therapy

**Smith College**                                        **M.S.W. awarded August 1977**
Northampton, Massachusetts
Clinical Social Work

**Colorado State University**                            **B.S. awarded December 1969**
Fort Collins, Colorado                                                **Cum Laude**
Sociology and Anthropology

### EXPERIENCE

**Carlin Knight, Esquire, Attorney at Law**          **September 2005 - present**

*Attorney:* Private practice law firm, concentrating in adoption and family law, including
divorce, child custody and support

**Smith & Knight, Attorneys at Law**                   **March 1998 - August 2005**

*Attorney:* Partner in general practice law firm, concentrating in adoption and family law,
including divorce, child custody and support

**The Law Firm of Michael P. Dignazio**              **February 1995 - March 1998**

*Attorney:* Associate in general practice law firm, concentrating in adoption and family law,
including divorce, child custody and support

RECEIVED DEC 1 7 2007

**Carlin Knight - Page Two**

**EXPERIENCE** (Continued)

**Court of Common Pleas of Delaware County**                    **June - December 1993**
The Honorable George Koudelis
Media, Pennsylvania

    *Law Clerk:* Drafted judicial opinions in family, criminal and civil cases; conducted legal research primarily in civil and criminal practice.

**Pennsylvania Civil Clinic**                    **January - May 1993**
Widener University School of Law

    *Student Attorney:* Represented clients in court hearings, judicial conferences and negotiations pursuant to Pennsylvania Supreme Court Rules 321 and 322 (divorce, child custody, child and spousal support); drafted pleadings, memoranda and briefs; and conducted legal research.

**Widener University**                    **September 1992 - December 1997**
Chester, Pennsylvania

    *Adjunct Assistant Professor:* Taught courses in child welfare policy and family violence in the graduate and undergraduate social work programs.

**Children and Youth Services of Delaware County**                    **1970 - 1992**
Media, Pennsylvania

    *Administrator of Legal Services* (May 1983 - October 1992): Directed and coordinated all legal actions for large child welfare agency, including juvenile dependency, termination of parental rights and adoption, administrative appeals, foster care reviews, tort and class actions in state and federal courts; supervised legal, social work and clerical staff; liaison with judges and other court personnel; drafted legal policies and procedures; conducted legal research and drafted briefs, pleadings and legal memoranda.

    *Supervisor, Intake and Child Protective Services* (1977 - 1983): Supervised social work staff conducting investigations and appearing in court regarding children and families referred for child abuse and neglect.

    *Social Worker, Foster Care Services* (1970 - 1976): Evaluated and provided treatment services to families and children placed in foster care as a result of child abuse and neglect; drafted court reports and testified in court proceedings.

**Private Practice**                    **1976-present**

    *Family Therapist, Educator, Consultant:* While working full time in above positions, held various positions as a family therapist, educator, and consultant both in private practice and through agencies and universities in Philadelphia, Montgomery and Delaware Counties, for the Pennsylvania Child Welfare Competency-Based Training and Certification program, and the Delaware County Bar Association. Consultant to Children and Youth Services of Delaware County on regular basis regarding laws, regulations, policies and planning.

**Carlin Knight - Page Three**

## PROFESSIONAL SOCIAL WORK/THERAPIST CERTIFICATIONS

Pennsylvania Social Work License, 1989
American Association for Marriage and Family Therapy, 1988
Academy of Certified Social Workers, 1979

## LEGAL AFFILIATIONS

Pennsylvania Bar Association
Family Law Section
Children's Rights Committee
Women in the Profession Committee
Gay and Lesbian Rights Committee, past Co-Chair of Adoption Legislation Sub-Committee

Delaware County Bar Association, Pennsylvania
Family Law Section, Current past Chair, Custody and Protection from Abuse Sub-Committees, past Co-Chair, Divorce Sub-Committee
Family Law Rules Committee
Orphans' Court Rules and Legal Education Committees
Civil Justice Advisory Committee

## OTHER PROFESSIONAL MEMBERSHIPS

Collaborative Law Affiliates
Women's Resource Center Attorney Affiliate
The Family Institute of Philadelphia

## SPECIALIZED LEGAL TRAINING

Family Law Advanced Mediation
Collaborative Family Law